UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. NAVISTAR INTERNATIONAL CORP., and NAVISTAR, INC., Defendants. | Case No: 15-cv-6143<br>Judge: Hon. James B. Zagel<br>Magistrate Judge: Hon. Susan E. Cox |

**UNITED STATES' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

Defendants Navistar International Corporation ("NIC") and Navistar, Inc. (collectively, "Navistar") introduced into commerce 7,749 "on-highway" heavy-duty diesel engines ("HDDEs") that were not covered by Certificates of Conformity ("COCs") (the "Subject Engines"), in violation of the Clean Air Act ("the Act"), 42 U.S.C. § 7522(a)(1); *see generally* Information Compiled from NIC's Response to EPA's 208 Information Request, Ex. A ("Subject Engines List") (previously filed as ECF No. 4). There is no genuine dispute of fact regarding Navistar's liability.

Even though assembly of almost all the Subject Engines began in 2009, Navistar fully assembled or produced the Subject Engines within the meaning of Environmental Protection Agency's ("EPA") regulations in 2010. Therefore, the Act required Navistar to obtain COCs certifying the engines' compliance with the EPA's Model Year ("MY") 2010 emissions standards before selling them. Navistar cannot dispute that it had no 2010 COCs for the Subject Engines, and therefore it is liable for selling 7,749 uncertified engines. Indeed, because a vast majority of the Subject Engines could not meet the MY2010 standards, Navistar could not have

obtained such certificates if it had sought them. By selling them as MY2009 engines, and purporting to rely on its 2009 COCs, Navistar evaded the more stringent MY2010 emission standards.

Navistar's primary defense to liability relies on EPA regulations that are inapplicable to this case. Specifically, Navistar claims it relied on regulations that apply to *nonroad* engines, instead of those regulating on-highway engines, to determine the Model Year of the Subject Engines. Because EPA's *nonroad* regulations do not apply, Navistar cannot invoke those regulations to prevent entry of summary judgment in the United States' favor. Nor do any of Navistar's affirmative defenses preclude summary judgment. Should the Court grant the United States' motion, the parties would proceed to litigate appropriate relief under the Act.

## BACKGROUND

Title II of the Act requires EPA to promulgate emissions standards for any pollutant from new vehicles and engines that causes or contributes to air pollution that may reasonably be anticipated to endanger public health or welfare. 42 U.S.C. § 7521(a)(1). The Act distinguishes between *on-highway* and *nonroad* vehicles and engines. 42 U.S.C. §§ 7521(a)(1), 7547(a), 7550.[1] *On-highway* engines are those used in motor vehicles designed to transport passengers or freight by road (*e.g.*, passenger cars and commercial trucks). 42 U.S.C. § 7550(2). *Nonroad* engines are internal combustion engines *not used in motor vehicles* (*e.g.*, locomotive, lawn mower, and marine vessel engines). 42 U.S.C. § 7550(10); *see* 40 C.F.R. § 1068.1(a) (2009).

[1] EPA has promulgated separate regulations for on-highway motor vehicles and engines, and nonroad vehicles and engines. Provisions for on-highway vehicles and engines are predominantly set forth at 40 C.F.R. Parts 85 and 86. Provisions for nonroad engines (*e.g.*, locomotive, dirt bike, and marine vessel engines) are set forth at 40 C.F.R. Parts 87, 89 through 92, 94, 1033, 1039 through 1060, and 1068. The nonroad regulations specifically exclude "heavy-duty motor vehicles and motor vehicle engines," such as on-highway HDDEs. 40 C.F.R. § 1068.1(b)(2) (2009).

In 2001, EPA issued regulations requiring all MY2010 and later on-highway HDDEs to meet a stringent standard of 0.20 grams of oxides of nitrogen ("$NO_x$") per brake horsepower-hour (g/bhp-hr) of operation or, for HDDEs participating in EPA's Averaging, Banking, and Trading ("ABT") program, a maximum of 0.50 g/bhp-hr of operation. *See* 40 C.F.R. § 86.007-11(a)(1)(i).[2] The more stringent emission standards required HDDE manufacturers to install advanced emission control equipment or apply pollution credits to offset excess emissions through the ABT program. *See generally Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements*, 66 Fed. Reg. 5002 (Jan. 18, 2001) (describing the MY2010 emission standards).

To comply with the Act, vehicle and engine manufacturers are required to submit an application for certification for each Model Year[3] of each engine family[4] the manufacturer intends to introduce into commerce. 42 U.S.C. § 7525(a). If EPA determines that the engine family described in a COC application meets the Act's requirements for the designated Model Year, it will issue a COC covering vehicles and engines belonging to that Model Year of the engine family. *Id.*; *see* 40 C.F.R. § 86.007-30(a)(1)–(2). It is a violation of the Act for any manufacturer to introduce into commerce any new engine not covered by a COC. 42 U.S.C. §§ 7522(a)(1), 7547(d). Importantly, a COC only covers on-highway motor vehicle engines

[2] $NO_x$ emissions contribute to the formation of fine particulate matter and ground-level ozone, a primary component of smog. *See United States v. Volvo Powertrain Corp.*, 758 F.3d 330, 335 (D.C. Cir. 2014). Elevated levels of fine particulate matter have been linked to "adverse human health consequences such as premature death, lung and cardiovascular disease, and asthma." *Id.* And "even at very low levels," inhalation of ozone "can cause serious health problems by damaging lung tissue and sensitizing lungs to other irritants." *Id.*

[3] Model Years are named after calendar rears, but a Model Year may begin up to 364 days prior to the calendar year for which it is named (January 2). 40 C.F.R. §§ 85.2302–85.2303. A Model Year must end on December 31 of the calendar year for which it is named. 40 C.F.R. §§ 85.2303, 85.2305(d).

[4] An engine family is a group of engines with similar emission characteristics. 40 C.F.R. § 86.096-24(a).

produced in the Model Year named in the COC. 40 C.F.R. § 85.2305(d); *see* 40 C.F.R. § 86.007-30(a)(2). As EPA regulations state:

> *Vehicles or engines produced after December 31 of the calendar year for which the model year is named are not covered by the certificate of conformity for that model year.* A new certificate of conformity demonstrating compliance with currently applicable standards must be obtained for these vehicles or engines *even if they are identical* to vehicles or engines built before December 31.

40 C.F.R. § 85.2305(d) (emphasis added); *see* 40 C.F.R. §§ 85.2302, 85.2303, 85.2305(a).[5] A Model Year for on-highway motor vehicle engines cannot extend beyond December 31 of the calendar year for which it is named. 40 C.F.R. §§ 85.2303, 85.2304(a).

There are two methods for determining when the Subject Engines were produced pursuant to the Act and, in turn, by which Model Year they could be covered. Which method applies depended on whether Navistar was using the regulations' "delegated assembly exemption" ("DAE") or not. Under either method, the Subject Engines were not MY2009.

For non-delegated assembly engines, the applicable regulations are found in 40 C.F.R. §§ 85.2301–2305. The on-highway regulations do not explicitly define "produced," but do define when an HDDE is "first produced" for the purpose of determining the start of a Model Year. An engine family is "first produced" when the manufacturer has completed production of the "first saleable unit," defined as the calendar date the manufacturer *completes all manufacturing and assembling processes* necessary to produce the first engine in the family that is materially identical to the engines described in the COC application. 40 C.F.R. § 85.2304(b) (2009). Thus, under the motor vehicle and motor vehicle engine regulations, an engine is "first produced"

[5] Production periods, and therefore Model Years, are determined differently for on-highway and nonroad engines. *Compare* 40 C.F.R. §§ 85.2302, 85.2304 *to* 40 C.F.R. §§ 1068.30, 1068.103(b). For nonroad engines, production must be complete within 30 or 60 days of the calendar year following the calendar year for which the Model Year is named, depending on engine size. 40 C.F.R. § 1068.103(f).

when it is completely assembled to its certified configuration. It follows that all other engines in the engine family are "produced" when they are completely assembled and are materially identical to the engine described in the COC application.

In addition to the Model Year provisions described above, slightly different language concerning assigning Model Years is found in the regulations' DAE. The DAE is an exemption that provides engine manufacturers increased flexibility to allow the shipment of on-highway HDDEs before installation of COC-specified after-treatment devices ("ATDs"), as long as the manufacturers ensure that the ATD is installed before delivery to the ultimate consumer. 40 C.F.R. § 85.1713; *Control of Emissions From Nonroad Spark-Ignition Engines and Equipment*, 73 Fed. Reg. 59034, 59178 (Oct. 8, 2008) ("*Emissions from Nonroad Engines*"). Navistar purported to certify some of its engines using the DAE. *See Excerpt of Subject Engines' COC Applications* at 28, 32 (No. 28, "DAE Election"), Ex. B ("COC Applications"). However, using this provision does not change when an engine's Model Year is assigned.

The DAE regulations in effect for MY2009 explained that "an engine you produce under this section becomes new when it is fully assembled, except for aftertreatment devices, for the first time. Use this date to determine the engine's model year." 40 C.F.R. § 85.1713(d) (2008).[6] Thus, for the purpose of determining Model Year, engines manufactured using the DAE are

[6] As a result of a clerical error, the DAE for MY2009 and earlier engines did not appear in the 2009 edition of the C.F.R. Nonetheless, Navistar applied the DAE to some of its MY2009 Subject Engines. COC Applications at 28, 32 (No. 28, "DAE Election"), Ex. B. Beginning with MY2010, the on-highway delegated assembly provisions changed, and directed people to the nonroad regulations' procedures on how to use the DAE. 40 C.F.R. § 85.1713 (2009), 40 C.F.R. § 1068.261. This revision removed § 85.1713's previously applicable instructions for on-highway DAE engine Model Year determination, but the regulation still stated that "[t]he engine's model year does not change based on the date the manufacturer adds the aftertreatment device." 40 C.F.R. § 85.1713(e). In other words, beginning in MY2010, to figure out the Model Year of a DAE HDDE, one looks to the instructions in 40 C.F.R. § 1068.261, and then to the revised 40 C.F.R. § 85.1713, which confirms that the Model Year does not change by the addition of the ATD. Contrary to Navistar's claims, the changes effective in MY2010 did not incorporate any other provision of 40 C.F.R. Part 1068 into 40 C.F.R. Part 85, such as, for example, Part 1068's different definition of the term Model Year.

produced when they are fully assembled, except for the ATDs. 40 C.F.R. §§ 85.1713(d), 85.2304(b). In any event, under either method of determining the Model Year, the Subject Engines were fully assembled or produced in 2010.

As noted above, Navistar's argument that its Subject Engines are MY2009 relies on inapplicable nonroad regulations. Model Year is determined differently for nonroad engines than for on-highway due to differences between these engine classes. For nonroad engines, Model Year is based on an engine's "date of manufacture," which is defined as the date the crankshaft is installed in the engine block. *Emissions from Nonroad Engines*, 73 Fed. Reg. at 59,346–48; *see* 40 C.F.R. § 1068.30 (definitions of "date of manufacture," "engines," "model year"). Navistar should not be permitted to misapply the nonroad regulations to evade stricter emissions limits.

## ARGUMENT

Summary judgment is proper when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To prevail, the nonmoving party "must go beyond mere allegations and offer specific facts demonstrating that there is a genuine issue for trial." *EEOC v. Staffmark Inv. LLC*, 67 F. Supp. 3d 885, 894 (N.D. Ill. 2014) (citations omitted). A disputed material fact is sufficient to avoid summary judgment "only if the disputed fact is determinative of the outcome under the applicable law." *Id.*

In order to establish a violation of Section 203(a) of the Act, the United States must prove: (1) Navistar is a manufacturer of new motor vehicle engines; (2) Navistar distributed, sold, offered for sale, introduced or delivered for introduction into commerce the new motor vehicle engines, or caused any of the foregoing; and (3) the Subject Engines were not covered by a COC. Items (1) and (2) cannot be reasonably disputed. United States' Rule 56.1 Statement of Material Facts ("SOF") ¶¶ 2–6, 9–10, 32. Navistar has not claimed that the Subject Engines were covered by MY2010 COCs. SOF ¶¶ 30–31. Thus, the only question is whether these engines

could be certified as MY2009. For the reasons discussed, it is clear that the Subject Engines were produced in 2010, could not be MY2009 engines, and could not be sold under 2009 COCs.

## I. **Because The Subject Engines Were "Produced" in 2010, The Engines Were Not Covered By MY2009 COCs**

On November 3, 2010, EPA issued a request for information pursuant to Section 208 of the Act, 42 U.S.C. § 7542, to NIC. SOF ¶ 19; Section 208 Request to NIC, Ex. F. Among other things, EPA's request sought the "Production Date" for HDDEs covered by MY2009 COCs. SOF ¶¶ 20, 22. In its request for information, EPA defined the term "Production Date" as follows:

> "Production Date" means 1) for engines designed to meet emission standards in engine families certified using the delegated assembly rule at 40 C.F.R. § 85.1713, *the calendar date all manufacturing and assembly necessary to produce a saleable engine is complete* except for the installation of any exhaust aftertreatment device; or 2) for engines designed to meet emissions standards in engine families that were not certified using the delegated assembly rule at 40 C.F.R. § 85.1713, *the calendar date all manufacturing and assembly necessary to produce a saleable engine is complete*.

SOF ¶ 21 (emphasis added). This definition is consistent with applicable regulations. *See, e.g.*, 40 C.F.R. §§ 85.2304(b), 85.2305(d).

On February 4, 2011, NIC reported that the "Engine Build Date" (used by Navistar synonymously with "Production Date") for all 7,749 Subject Engines—which include some delegated assembly engines—occurred in 2010, and some as late the fall of 2010. SOF ¶¶ 23–29; *See* Subject Engines List, Column F, Line 7750, Ex. A. At the latest, MY2009 ended on December 31, 2009. *See* 40 C.F.R. § 85.2304(a). For some Subject Engines, assembly began in 2009, but no Subject Engine was completely assembled—and therefore none were "fully assembled" or "produced" pursuant to on-highway regulations—that year. *See generally*, Subject Engines List Column F ("E Build Date"), Ex. A.

Navistar will likely claim that the installation of a crankshaft at the beginning of the assembly process constitutes production for the purpose of determining the Subject Engines' Model Year. *See, e.g.*, *Proposed Scheduling Order of Defendants Navistar Int'l Corp. and Navistar, Inc.* at 2 (ECF No. 29). However, as discussed *supra*, at 6, the installation of a crankshaft only controls the Model Year determination for *nonroad* engines. The nonroad regulations are clear on their face that they do not apply to Navistar's 7,749 heavy-duty diesel engines. Under the nonroad subsection entitled "Does this part apply to me?," the regulations state: "(b) This part does not apply to any of the following engine or vehicle categories…(2) Heavy-duty motor vehicles and motor vehicle engines (*see* C.F.R. part 86)." 40 C.F.R. § 1068.1(b) (2009). Navistar admits that the Subjects Engines are not nonroad. SOF ¶ 18.

Navistar sold the Subject Engines under MY2009 COCs. SOF ¶¶ 31–32. Based on regulations applicable to HDDEs, the Subject Engines were produced after December 31, 2009, and cannot be covered by MY2009 COCs. *See* 40 C.F.R. § 85.2305(d). Based on Navistar's own admissions, the earliest Model Year that could apply to the Subject Engines was MY2010. *See generally*, Subject Engines List Column F ("E Build Date"), Ex. A. This result is the same regardless of whether the Subject Engines used the DAE: the Model Year of a DAE does not change based on the ATD installation date. *See* 40 C.F.R. § 85.1713(d) (2008).

To obtain MY2010 COCs, Navistar would have had to install advanced emission control equipment on the Subject Engines to meet the more stringent MY2010 emissions standards, or use valuable credits it had banked under EPA's ABT program. *See* 40 C.F.R. §§ 86.007-11, 86.007-15. As built, the vast majority of Subject Engines did not comply with 2010 emission requirements and could not have been certified. *See* 40 C.F.R. § 86.007-11(a)(1)(i)(B); COC Applications at 3, 7, 11, 15, 19, 23, 27, 31 (No. 22, "Family Emission Limits"), Ex. B. Because

the Subject Engines were not covered by MY2009 or MY2010 COCs, Navistar was prohibited from selling or otherwise introducing them into commerce. *See* 42 U.S.C. § 7522(a)(1). Nevertheless, Navistar sold the Subject Engines under MY2009 COCs. SOF ¶¶ 31–32.

## II. Navistar's Defenses Do Not Preclude Summary Judgment On Liability

Navistar has invoked eight affirmative defenses.[7] None raise genuine issues of material fact or prevent entry of summary judgment on Navistar's 7,749 violations of the Act.

***First Affirmative Defense***. According to Navistar, the United States' complaint fails "to state a claim upon which relief can be granted." Navistar, Inc.'s Answer, ECF No. 24, at 18; NIC's Answer, ECF No. 25, at 18. This defense does not prevent summary judgment because it "is nothing more than a recitation of the standard for a motion to dismiss under Rule 12(b)(6)." *Reis Robotics USA v. Concept Indus.*, 462 F. Supp. 2d 897, 905 (N.D. Ill. 2006).

***Second Affirmative Defense***. Navistar claims that the United States' requested relief "is barred because it is overbroad and fails to adequately specify the grounds and scope of the requested injunctive relief." Navistar, Inc.'s Answer, ECF No. 24, at 19; NIC's Answer, ECF No. 25, at 18. This defense relates to remedy, is therefore only relevant to the remedy phase of this proceeding, and does not foreclose summary judgment on liability.

***Third Affirmative Defense***. Navistar asserts that applicable regulations did not provide "fair notice" and that "due process forbids the retroactive imposition" of EPA's "new and vague and shifting legal views of the [Act] and its implementing regulations." Navistar, Inc.'s Answer, ECF No. 24, at 19; NIC's Answer, ECF No. 25, at 18. Fair notice is not applicable here. The fair notice doctrine prevents "application of a regulation that fails to give fair warning of the conduct

[7] Affirmative defenses are subject to all pleading requirements of the Federal Rules of Civil Procedure. *See Heller Fin. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294–95 (7th Cir. 1989). They must allege all necessary elements and be more than conclusory assertions. *Id.* at 1295.

it prohibits or requires." *United States v. S. Indiana Gas & Elec. Co.*, 245 F. Supp. 2d 994, 1010 (S.D. Ind. 2003). "If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." *Id.* (citing *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995)); *see Faultless Div., Bliss & Laughlin Indus. v. Sec'y of Labor*, 674 F.2d 1177, 1185 (7th Cir. 1982) ("[A]ll that due process requires is a fair and reasonable warning.").

Navistar cannot plausibly claim it lacked fair notice, the Act's certification requirement has been in place since the 1970s.[8] *See, e.g., United States v. Chrysler Corp.*, 591 F.2d 958, 959 (D.C. Cir. 1979) (involving manufacturer's violation of the Act for selling vehicles without COCs). Likewise, EPA's on-highway motor vehicle engine Model Year certification regulations have been codified for years. *See* 40 C.F.R. §§ 85.2302–85.2304 (1995)–(2015). Because the plain language of these regulations provided the regulated community "ascertainable certainty" of the meaning of applicable standards, the fair notice affirmative defense does not preclude summary judgment. *S. Indiana*, 245 F. Supp. 2d at 1011.

***Fourth Affirmative Defense***. Navistar asserts that the United States' claims "are barred, in whole or in part, by the doctrines of estoppel, waiver and laches, and because Plaintiff comes to Court with unclean hands."[9] Navistar, Inc.'s Answer, ECF No. 24, at 19; NIC's Answer, ECF No. 25, at 18. These defenses are inapplicable and do not preclude summary judgment.

---

[8] Navistar admits that the regulations relating to COCs (40 CFR §§ 86.004-21, 86.007-21, 86.007-30(a)(1) & (2), 86.094-21) and the determination of Model Year (40 CFR §§ 85.2302, 85.2303, 85.2304, 85.2305(a) & (d)) speak for themselves. SOF ¶¶ 16–17.

[9] Unclean hands is only relevant to the question of remedy, *Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985), and should not preclude summary judgment on Navistar's liability. The bad conduct

The United States is rarely estopped,[10] and the defense "requires an affirmative act to misrepresent or mislead." *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000); *see also Matamoros v. Grams*, 706 F.3d 783, 794 (7th Cir. 2013). This is an extremely high standard. For example, an omission—even a failure to discharge an affirmative obligation—is not affirmative misconduct under the estoppel standard. *Matamoros*, 706 F.3d at 794 (citing *Lewis v. Washington*, 300 F.3d 829, 834–35 (7th Cir. 2002); *Edgewater Hosp. v. Bowen*, 857 F.2d 1123, 1138 n.8). Reliance on the oral representations of a government official is also unreasonable, especially when the written regulations are clear. *See, e.g.*, *EPA v. Envtl Waste Control*, 917 F.2d 327, 334 (7th Cir. 1990). This expectation is borne of courts' assumptions that citizens—let alone large corporations—know the law. *Heckler v. Cmty Health Serv. of Crawford Cty.*, 467 U.S. 51, 63–64 (1984) ("…[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to the law."); *see, supra*, n.8. Navistar fails to identify any affirmative misconduct by the United States.

Navistar points to communications "as early as 2008" between Navistar and EPA personnel, during which Navistar purportedly explained its "strategy" for "engine phase-in to 2010 emission rules." Navistar, Inc.'s Answer, ECF No. 24, at 19; NIC's Answer, ECF No. 25, at 18. However, in its certified responses to the United States' Interrogatories, the most Navistar has said was that "EPA did not state an objection to the proposed transition plan" and that EPA

---

constituting unclean hands must also involve "fraud, unconscionability or bad faith," which Navistar does not assert. *Int'l Union, Allied Indus. Workers of Am. v. Local Union 589, Allied Indus. Workers of Am., AFL–CIO*, 693 F.2d 666, 672 (7th Cir. 1982).

[10] "The Supreme Court has *never* affirmed a finding of estoppel against the government. And that is not for lack of review. The Court, in fact, has 'reversed every finding of estoppel that [it has] ever reviewed.'" *Gutierres v. Gonzales*, 458 458 F.3d 688, 691 (7th Cir. 2006) (internal quotation omitted); *see also Edgewater Hosp.*, 857 F.2d at 1138 (questioning whether "estoppel can ever be appropriately applied against the Government").

"remained silent." Navistar, Inc.'s Resp. to United States' Phase 1 Interrog. No. 5, Ex. D; *see also* NIC Resp. to United States' Phase 1 Interrog. No. 5, Ex. G.[11] Even if Navistar's description of its "communications" with EPA is accurate, "lack of objection" does not constitute affirmative misconduct under the estoppel standard—especially in this case, because the applicable regulations are clear on their face.

To establish estoppel, Navistar must also have been ignorant of the facts. *See Edgewater Hosp.*, 857 F.2d at 1138; *see also Heckler*, 467 U.S. at 63–64; *Trapper Mining v. Lujan*, 923 F.2d 774 (10th Cir. 1991). As a large international manufacturing company with access to sophisticated resources, it is implausible that Navistar was unaware of the Act's certification requirements in this instance, and Navistar has pleaded no such ignorance.

To establish waiver, "a clear and distinct manifestation of such an intent [to relinquish] must be found." *Am. Nat'l Bank & Trust Co. of Chicago v. K-Mart Corp.*, 717 F.2d 394, 398 (7th Cir. 1983). "[A] waiver of sovereign authority will not be implied, but instead must be surrendered in unmistakable terms." *United States v. Cherokee Nation of Okla.*, 480 U.S. 700, 707 (1987). Indeed, courts have explained that it is doubtful that public officials at the EPA or DOJ have any authority to waive a claim under the [Clean Air Act]," because the statute benefits the American people and, therefore, "generally speaking public officers have no power or authority to waive the enforcement of the law on behalf of the public." *United States v. S. Indiana Gas & Elec. Co.*, No. IP 99–1692–C–M/F, 2003 WL 446280, at *4 (S.D. Ind., Feb. 18, 2003) (citation omitted). Navistar has alleged no facts suggesting any intent on the behalf of the

[11] Surely, if EPA had given Navistar's plan any affirmative approval, the company would have included it in this Interrogatory Response. Even if approval was given, Navistar was on notice of the disparity between any informal EPA communications and the Act's clear regulations and official guidance. *See, e.g., Heckler*, 467 U.S. at 63–64.

United States to waive its claims, and because the government may not waive the rights of the public, waiver cannot apply here. *Id.*

Laches applies to only parties "who delay the assertion of their claims for an unreasonable time" to the detriment of the defendant. *United States v. Philip Morris*, 300 F. Supp. 2d 61, 72 (D.D.C. 2004); *Reich v. Sea Sprite Boat Co.*, 50 F.3d 413, 418 (7th Cir. 1995). "It is well settled that the United States is not…subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940); *see also Silverman v. Commodity Futures Trading Comm'n*, 549 F. 2d 28, 34 (7th Cir. 1977); *SEC v. Fisher*, No. 07 C 4483, 2009 WL 780215, at *2 (N.D. Ill. Mar. 20, 2009). Navistar has not alleged facts supporting the defense (assuming it is actionable). Regardless, filing an enforcement action within the statute of limitations cannot be characterized as unreasonable delay.

Navistar identifies provisions in the Code of Federal Regulations (*i.e.*, 40 C.F.R. §§ 1068.30, 1068.103(a), 1068.103(b)) and the Federal Register (*i.e.*, *Emissions from Nonroad Engines*, 73 Fed. Reg. 59,034, 59,132–33, 59,346) by which EPA purportedly informed the industry that "model year" can be determined as the "date on which the crankshaft is installed in an engine block," rather than the date that an engine is fully completed or assembled. Navistar, Inc.'s Answer, ECF No. 24, at 19; NIC's Answer, ECF No. 25, at 19. These are nonroad regulations that are inapplicable to Navistar's on-highway HDDEs. *See* 40 C.F.R. § 1068.1(b)(2) (Part 1068 does not apply to heavy-duty motor vehicle and engines); *Emissions from Nonroad Engines*, 73 Fed. Reg. at 59,131–34. Navistar argues that, because it previously used the date of crankshaft installation to determine Model Year, it would be improper for EPA to hold Navistar to a "different standard" now. Navistar, Inc.'s Answer, ECF No. 24, at 20; NIC's Answer, ECF No. 25, at 19–20.

Even if the nonroad regulations *did* apply to the Subject Engines, Navistar would still be in violation, because production of nonroad engines must cease within 30 or 60 days of the New Year to be included under the previous Model Year, and the Subject Engines were completed throughout most of 2010. 40 C.F.R. § 1068.103(f); *see also* Subject Engines List Column F, Lines 7600–7750, Ex. A.

None of these facts impact liability, nor do they support estoppel, waiver or laches against the United States.

***Fifth Affirmative Defense***. According to Navistar, because EPA "has not defined what constitutes an 'engine' for purposes of production of an engine and regulatory compliance on which it asserts its claims here," Navistar's "reasonable interpretation of the regulations" cannot be a violation of the law. Navistar, Inc.'s Answer, ECF No. 24, at 21; NIC's Answer, ECF No. 25, at 20 (citing 73 Fed. Reg. at 59,132). Here again, however, Navistar cites to inapplicable regulatory provisions relating to nonroad engines, as opposed to on-highway engines. *See generally Emissions from Nonroad Engines*, 73 Fed. Reg. at 59,131–34. As discussed *supra*, Navistar had fair notice of the certification requirements that apply to on-highway motor vehicle engines, which have been codified—and presumably followed by Navistar—for many years.

***Sixth Affirmative Defense***. Navistar asserts that EPA has applied different interpretations of applicable regulations to other manufacturers "in the same or similar" position as Navistar. Navistar, Inc.'s Answer, ECF No. 24, at 21; NIC's Answer, ECF No. 25, at 20. This is no defense to liability. Whether EPA has taken enforcement action against other manufacturers for similar conduct does not preclude summary judgment. The agency "has broad discretion to choose how best to bring an enforcement action." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007).

***Seventh Affirmative Defense***. Navistar invokes EPA's "unreasonable interpretation" of the applicable regulations. Navistar, Inc.'s Answer, ECF No. 24, at 21; NIC's Answer, ECF No. 25, at 21. The regulations are clear on their face and interpreted accordingly. That notwithstanding, analysis of regulations is a legal matter that the Court can resolve through summary judgment.

***Eighth Affirmative Defense***. Navistar asserts that the United States seeks to impose an "obviously unreasonable penalty" that violates the "constitutional prohibition on excessive fines." Navistar, Inc.'s Answer, ECF No. 24, at 22; NIC's Answer, ECF No. 25, at 21. As this defense relates to penalty, it does not preclude summary judgment regarding liability.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests entry of an order granting the United States summary judgment on Navistar's liability for 7,749 violations of the Act.

Respectfully Submitted,

May 13, 2016

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division

*/s/ Abigail E. Andre*
ABIGAIL E. ANDRE
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
999 18th Street – South Terrace, Suite 370
Denver, CO 80202
(303) 844-1379
abigail.andre@usdoj.gov

DEANNA J. CHANG
Senior Counsel
Environmental Enforcement Section
U.S Department of Justice

805 SW Broadway, Suite 600
Portland, OR 97205
(503) 231-2128
deanna.chang@usdoj.gov

KEITH T. TASHIMA
Senior Attorney
SEAN CARMAN
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
PO Box 7611 Ben Franklin Station
Washington, DC 20001-7611
(202) 616-9643 (Tashima)
(202) 514-2746 (Carman)
keith.tashima@usdoj.gov
sean.carman@usdoj.gov

OF COUNSEL:

ED KULSCHINKSY
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Room 1142C, Mailcode 2242A
Washington, DC 20460
(202) 564-4133
kulschinsky.edward@epa.gov