UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

_____

UNITED STATES OF AMERICA,                )
                                         )
                                         )   Case No:  15-cv-6143
                Plaintiff,               )
                                         )
                                         )   Judge:  Hon. James B. Zagel
        v.                               )
                                         )   Magistrate Judge: Hon. Susan E. Cox
                                         )
NAVISTAR INTERNATIONAL CORP., and        )
NAVISTAR, INC.,                          )
                                         )
                                         )
                Defendants.              )
_____ )

**REPLY MEMORANDUM IN FURTHER SUPPORT OF THE UNITED STATES'
MOTION FOR SUMMARY JUDGMENT ON LIABILITY AS TO NAVISTAR, INC.[1]**

---

[1] This Reply Memorandum addresses Navistar, Inc.'s liability only. The United States'
Memorandum in Opposition to the Cross-Motion of Navistar International Corporation ("NIC")
will also incorporate the government's reply in support of its motion against NIC. *See* Docket
Entry (Dkt. #59) dated July 1, 2016. The Parties Rule 56.1 Statements of Material Facts ("Pl.
SOF"), will be served and filed consistent with this briefing schedule.

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

LEGAL STANDARDS ...........................................................................................................2

ARGUMENT ...........................................................................................................................3

I.    UNDISPUTED MATERIAL FACTS ESTABLISH NAVISTAR'S LIABILITY .......3

II.    ON-HIGHWAY REGULATIONS CLEARLY ESTABLISH WHAT ENGINES ARE COVERED BY A CERTIFICATE OF CONFORMITY ...................................6

    A.  The Regulations and Facts Demonstrate that Navistar's Subject Engines Were Fully Assembled, and Thus Produced, in 2010 and are Not Covered by Navistar's Model Year 2009 COCs ........................................................................6

    B.  Navistar's Description of 40 C.F.R. Part 85 Subpart X as Applying Only to Section 177 of the Act Is Categorically False........................................................10

    C.  Navistar's Arguments About 40 C.F.R. § 1068 Do Not Undermine the Plain Language of Part 85. .................................................................................................11

        i.  40 C.F.R. Part 1068's Regulatory Scheme is Tailored to the Type of Engines it Covers, Not HDDEs. ....................................................................11

        ii.  Navistar's Claim That "In 2008, EPA Did Define an Engine's 'Date of Manufacture' as the Date a Crankshaft is Installed in the Engine Block" is Misleading...............................................................................................12

        iii.  And Defendants Knew That Part 1068 Did Not Apply to HDDEs. ..........13

        iv.  Proposed Revisions to Regulations in 2015 are Irrelevant to Navistar's 2009 Violations...........................................................................................14

III.    WHILE THE REGULATIONS AT ISSUE ARE CLEAR, IF THIS COURT FINDS OTHERWISE, IT SHOULD DEFER TO EPA'S CONSISTENT INTERPRETATION OF THE REGULATIONS........................................................15

    A.  EPA's Longstanding Interpretation of The Relevant Regulations Reflects EPA's Fair and Considered Judgment .................................................................16

    B.  Navistar's Arguments About the Federal Register Notices in 2008 and 2015 do not Show Inconsistency by EPA......................................................................19

    C.  Contrary to Navistar's Suggestion, the Mitsubishi Letters are Not Inconsistent...20

IV.    THE DELEGATED ASSEMBLY EXEMPTION DOES NOT SUPPORT AN
ARGUMENT THAT NAVISTAR'S ENGINES ARE COVERED BY THE
MODEL YEAR 2009 COC ......................................................................................22

V.    NAVISTAR'S IS NOT ENTITLED TO DISCOVERY UNDER RULE 56(D)
BECAUSE THE DOCUMENTS IT SEEKS COULD NOT CREATE A
GENUINE ISSUE OF MATERIAL FACT..................................................................23

    A.  The Overbroad Discovery Sought by Navistar Illustrates That No Genuine
Issues of Material Fact Exist...................................................................................25

    B.  Navistar is Incorrect in Asserting That the United States Has Conceded That
the Discovery Navistar Now Seeks is Relevant to Liability...................................26

VI.    NAVISTAR HAD FAIR NOTICE OF THEIR OBLIGATIONS UNDER LAW
THAT HAS NOT SUBSTANTIVELY CHANGED IN DECADES..........................26

    A.  The Fair Notice Defense is Irrelevant to the Liability Phase.................................27

    B.  Navistar's Fair Notice Defense Fails Because the Applicable Regulations are
Not "Incomprehensibly Vague."..............................................................................28

    C.  EPA's Interpretation of Applicable Regulations Has Not Changed and is
Not Unforeseen ........................................................................................................28

CONCLUSION....................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*Adler v. Madigan*,
939 F.2d 476 (7th Cir. 1991) ........................................................ 2, 5

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................ 2

*Auer v. Robbins*,
519 U.S. 452 (1997) ........................................................ 16

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir. 2015) ........................................................ 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 ........................................................ 2

*Chevron U.S.A. v. Natural Resources Defense Council*,
467 U.S. 837 (1984) ........................................................ 17, 24

*Christensen v. Harris County,*
529 U.S. 576 (2000) ........................................................ 3, 15, 24

*Christopher v. SmithKline Beecham Corp.*,
132 S.Ct. 2156 (2012) ........................................................ 16

*Citizens for Appropriate Rural Roads v. Foxx,*
815 F.3d 1068 (7th Cir. 2016) ........................................................ 23

*Citizens for Appropriate Rural Roads, Inc. v. Foxx,*
14 F. Supp. 3d 1217 (S.D. Ind. 2014) ........................................................ 23

*Convertino v. U.S. Dep't of Justice,*
684 F.3d 93 (D.C. Cir. 2012) ........................................................ 23

*Crain v. Board of Police Comm'rs,*
920 F.2d 1402 (8th Cir.1990) ........................................................ 2

*Davis v. G.N. Mortg. Corp.*,
396 F.3d 869 (7th Cir. 2005) ........................................................ 23, 25

*Gen. Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) ........................................................ 27

*In re CWM Chem. Servs., Inc.*
6 E.A.D. 1 (EAB 1995) ........................................................ 29

*International Paper Co. v. Federal Power Comm'n,*
438 F.2d 1349 (2d Cir.1971) ........................................................ 24

*Ioffe v. Skokie Motor Sales, Inc.*,
414 F.3d 708 (7th Cir. 2005) ........................................................ 3, 6, 8

*Kegley v. AT&T Corp.*, No. 96 C
6677, 1998 WL 895674 (N.D. Ill. Dec. 8, 1998) ........................................................ 2, 30

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ........................................................ 26

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........................................................ 2

*Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*,
   83 F.3d 833 (7th Cir. 1996) ................................................................ 2, 28
*OneBeacon Ins. Co. v. U.S. Foods, Inc*,
   304 F.R.D. 536 (N.D. Ill. 2014) ....................................................... 23, 24
*Rollins Envtl. Srvcs. Inc. v. EPA*,
   937 F.2d 649 (D.C. Cir. 1991) .................................................................. 28
*Spierer v. Rossman*,
   No. 1:13-CV-00991-TWP, 2014 WL 4908023 (S.D. Ind. Sept. 30, 2014) ................ 23, 24, 25
*Texas Eastern Prod. Pipeline Co. v. Occupational Safety and Health Review Comm'n*,
   827 F.2d 46 (1987) ...................................................................... 27, 28
*Trinity Broadcasting of Florida v. FCC*,
   211 F.3d 618 (D.C. Cir. 2000) .................................................................. 27
*U.S. v. Am. Nat'l Can Co.*,
   126 F. Supp. 2d 521 (N.D. Ill. 2000) .................................................. 27, 28, 29
*United States v. Chrysler Corp.*,
   591 F.2d 958 (D.C. Cir. 1979) .................................................................... 9
*United States v. Farley*,
   11 F.3d 1385 (7th Cir. 1993) ............................................................... 24, 26
*United States v. Pitt-Des Moines, Inc.*,
   970 F. Supp. 1346 (N.D. Ill. 1997) ........................................................... 28
*United States v. S. Ind. Gas & Elec. Co.*,
   245 F. Supp. 2d 994 (S.D. Ind. 2003) ......................................................... 27
*R.T. Vanderbilt Co., Inc. v. U.S.*,
   2010 WL 2706282 *2, A.F.T.R.2d 2010-5171 (FC July 8, 2010) .................................. 24


**Statutes**
42 U.S.C. § 7521(a) .............................................................................. 20
42 U.S.C. § 7522(a) .............................................................................. 16
42 U.S.C. § 7522(a)(1) .......................................................................... 3, 7
42 U.S.C. § 7550 ................................................................................ 12
42 U.S.C. § 7550(2) ........................................................................... 11, 20

**Regulations**
40 C.F.R. Part 1068 ........................................................................ passim
40 C.F.R. Part 1086 .............................................................................. 12
40 C.F.R. Part 85 .................................................................... 7, 13, 17, 18
40 C.F.R. Part 85 Subpart X ............................................................. 1, 10, 11
40 C.F.R. § 85.074-30(a)(2) (1976) ............................................................... 9
40 C.F.R. § 85.1317 ............................................................................. 22
40 C.F.R. § 85.1906(b) .......................................................................... 13
40 C.F.R. § 85.2302 ........................................................................... 7, 8
40 C.F.R. § 85.2303 .............................................................................. 7
40 C.F.R. § 85.2304 ......................................................................... 11, 21
40 C.F.R. § 85.2305 ............................................................................. 17
40 C.F.R. § 85.2305(a-d) ......................................................................... 5
40 C.F.R. § 86.095-35 ........................................................................... 13
40 C.F.R. § 1068 ............................................................................ 11, 30

40 C.F.R. § 1068.1(b) ............................................................... 7, 11, 19

40 C.F.R. § 1068.103(f) ................................................................... 15

40 C.F.R. § 1068.30 .................................................................. passim

40 C.F.R. § 85.1713 ......................................................................... 22

40 C.F.R. § 85.2301 .................................................................... 7, 10

40 C.F.R. § 85.2304(a) ............................................................... 8, 9, 17

40 C.F.R. § 85.2304(b) .............................................................. passim

40 C.F.R. § 85.2305(a) ............................................................... 8, 9, 11

40 C.F.R. § 85.2305(d) ...................................................................... 7

40 C.F.R. § 86.007-30 ...................................................................... 7

40 C.F.R. § 86.082-2 .................................................................. 11, 20

40 C.F.R. §§ 2301–2305 ................................................................... 7

40 C.F.R. §§ 86.007-21(a) ................................................................ 9

42 C.F.R. § 7525(a)(1) ..................................................................... 7

59 Fed. Reg. 31306 ......................................................................... 12

61 Fed. Reg. 58102 ......................................................................... 18

66 Fed. Reg. 5002 ............................................................................ 1

73 Fed. Reg. 59034 ................................................................... 12, 19

80 Fed. Reg. 40138 ................................................................... 14, 19

## INTRODUCTION

Navistar, Inc. ("Navistar") concedes all material facts necessary to grant summary judgment: (1) the company is the manufacturer of the Subject Engines (7,749 on-highway heavy duty diesel engines ("HDDEs")); (2) which were certified as Model Year ("Model Year" or "MY") 2009; (3) the Subject Engines were fully assembled within the meaning of the Environmental Protection Agency's ("EPA") HDDE regulations in 2010, not 2009; and (4) Navistar introduced them into commerce. Based on the *only regulations applicable* to the Subject Engines' Model Year determination at the time of the violation, 40 C.F.R. Part 85 Subpart X, Navistar has admitted its own liability. Because Navistar's Opposition to Summary Judgment ("Opposition") fails to identify any genuine issue of material fact, the United States' Summary Judgment Motion should be granted.

The Parties only disagree about whether the engines were covered by the MY2009 COCs. This is a question of law that can easily be disposed of because the regulations are clear on their face. The law also clearly prohibits application of nonroad regulations to the Subject Engines. Navistar's self-serving decision to take a cafeteria approach to its legal obligations enabled it to delay implementation of stringent new emissions standards for MY2010 HDDEs projected to substantially reduce harmful pollutants in engine exhaust and yield billions of dollars in public health benefits.[2] Even if Court finds the regulations unclear, this Court should defer to EPA's interpretation of the law, which has remained consistent for decades.

---

[2] "We project that by 2030, this phase 2 program will reduce annual emissions of NOx, [nonmethane hydrocarbons], and [particulate matter] by 2.6 million, 115,000 and 109,000 tons, respectively. These emission reductions will prevent 8,300 premature deaths, over 9,500 hospitalizations, and 1.5 million work days lost. All told the benefits of this rule equal $70.3 billion." *Control of Air Pollution from New Motor Vehicles: Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur Control Requirements*, 66 Fed. Reg. 5002, 5005 (Jan. 18, 2001).

Because Navistar does not argue that the Delegated Assembly Exemption ("DAE") impacts the Subject Engines' Model Year and admits the exemption does not address the question at bar, it does not impact the outcome of this case. Opp. Br. at 11. Many of Navistar's arguments become irrelevant if the Court determines the regulations are clear on their face, (*e.g.*, Rule 56(d), fair notice), or otherwise fail on the merits. These and other arguments in Navistar's Opposition create confusion where there is none and suggest the existence of allegedly material facts without providing a scintilla of evidence. While some matters raised by Navistar may be relevant to penalty, none create a genuine issue of material fact that could defeat the United States' Motion.

## LEGAL STANDARDS

Once the United States discharges its burden of showing there is no genuine issue of material fact, Navistar must identify, and present evidence for, genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (party opposing summary judgment "must do more than simply show there is some metaphysical doubt as to the material facts."); *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 842 (7th Cir. 1996) (mere existence of *some* alleged factual dispute will not defeat summary judgment). "The court must only draw reasonable inferences based on the evidence in the plaintiff's favor and not all conceivable inferences," *Kegley v. AT&T Corp.*, No. 96 C 6677, 1998 WL 895674, at *2 (N.D. Ill. Dec. 8, 1998) (internal citations omitted).

"Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Adler v. Madigan*, 939 F.2d 476, 478 (7th Cir. 1991) (quoting *Crain*

*v. Board of Police Comm'rs,* 920 F.2d 1402, 1405–06 (8th Cir.1990)). Such is the case here.

When asked to interpret the meaning of regulations, Courts first determine whether the

regulatory language has an unambiguous meaning with regard to the particular dispute in the

case. *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 710 (7th Cir. 2005). If the regulatory text is

unambiguous, Courts apply the text of the regulations. *See Christensen v. Harris County,* 529

U.S. 576, 588 (2000). Because the regulations are clear on their face, and Navistar has presented

no genuine issues of material facts, and under Rule 56(d) only seeks discovery of EPA's non-

public legal interpretation, summary judgment should be granted in the government's favor.

## ARGUMENT

No genuine issues of material fact exist pertaining to Navistar's liability. The applicable

on-highway regulations are clear on their face, as is the inapplicability of the nonroad regulations

on which Navistar relies. Even if the Court does not agree that the regulations are clear, it should

defer to EPA's consistent, decades-long public interpretations of the regulations. Because the

applicable regulations are clear, Navistar's request for discovery into additional EPA guidance

documents is irrelevant. Finally, Navistar has failed to identify any genuine issue of material fact

with respect to its affirmative defenses.

### I.       UNDISPUTED MATERIAL FACTS ESTABLISH NAVISTAR'S LIABILITY[3]

The Act prohibits manufacturers from introducing new motor vehicle engines into

commerce without properly issued COCs. 42 U.S.C. § 7522(a)(1). Based on applicable on-

---

[3] Notwithstanding Navistar's considerable efforts to identify and support a genuine issue of material fact, as set forth in the United States' Response to Navistar, Inc.'s Rule 56.1(b)(3) Statement of Additional Material Facts, it has not identified material facts (nor put any of them genuinely at issue) sufficient to defeat the United States' Motion. Indeed, the overwhelming majority of Navistar's responses to the government's statements of fact and its supplemental statements of fact are immaterial, even if the Court assumes that Navistar would be able to establish those facts at trial.

highway regulations, Navistar has admitted every fact required to support a finding of 7,749 violations of the Act. The facts proving Navistar's liability are not in dispute.[4]

Navistar manufactured the Subject Engines and introduced them into commerce. NAV SOF at 17. It is undisputed that the Subject Engines were certified as MY2009. *Id.*

It is also undisputed that assembly of the Subject Engines continued past December 31, 2009, despite Navistar's convoluted objections on this issue. NAV Response to Pl. SOF 23–25; Decl. of Greg Orehowsky at ¶ 11 (Exh. C to United States' Motion for Partial Summary Judgment on Liability). Navistar claims that it does not use the term "Engine Build Date" synonymously with "Production Date" in response to EPA's 208 Request, (NAV. Resp. to Pl. SOF 11),[5] but admits that it interprets EPA's definition of "Production Date" to "equate" to the company's use of the term "Engine Build Date." NAV Resp. to 208 Request (Exh. H to United States' Motion for Partial Summary Judgment on Liability); NAV Resp. to Pl. SOF 25. Navistar does not dispute that "Engine Build Date" is also known as "E Build Date," (*Id.* at 13), and "that 7,749 engines are identified in Exhibit A to the Amended Complaint that the parties refer to as the Subject Engines, and for such engines, the Consolidated Spreadsheet lists 'E Build' dates in

---

[4] Navistar also concedes that it changed its Model Year designation practices in 2009-2010. Opp. Br. at 7. Navistar also concedes that "the regulations and EPA's public guidance have not changed." Opp. Br. at 10. Further discussion of undisputed facts is in the United States' Reply to Navistar's Rule 56.1(b)(3) Statement of Additional Material Facts.

[5] However, the Defendant agrees that the Section 208 Request included a definition of "Production Date:" "…the calendar date all manufacturing and assembly necessary to produce a saleable engine is complete." Navistar claims EPA's definition of "Production Date" in its Section 208 Request does not track the regulatory language. NAV. Resp. to Pl. SOF 25. That is incorrect. With the exception of reference to the DAE, 'Production Date' tracks the language of 40 C.F.R. § 85.2304(b), which defines Job 1 Date: "date on which a manufacturer completes all manufacturing and assembling processes necessary to produce the first saleable unit…."

2010." *Id.* at 15–16. From these statements, there is no dispute that assembly of the Subject Engines was not complete until on or after January 1, 2010.[6]

The only unresolved issue before the Court is whether COCs issued for MY2009 covered the Subject Engines. For its part, Navistar claims that nonroad regulations determine HDDEs' Model Year and that on-highway regulations are mysteriously silent on the question at bar. The United States argues that the on-highway regulations apply and are clear. This is a question of legal interpretation, and the relevant facts—that Navistar certified the Subject Engines as MY2009 and production was not complete until 2010—are not in dispute. Exh. A to United States' Memorandum in Support of Motion for Partial Summary Judgement on Liability. Therefore, this issue is appropriate for summary judgment. *Adler v. Madigan*, 939 F.2d at 478.

As set forth in greater detail below, Navistar's reliance on inapplicable nonroad regulations to determine the Subject Engines' Model Year is misplaced. Opp. Br. at 15–17. Navistar claims that the Subject Engines were MY2009 based on their "date of manufacture," (crank-in-block installation date, 40 C.F.R. § 1068.30) (Opp. Br. at 15), but date of manufacture is only used to determine a *nonroad* engine family's Model Year, not the Model Years of *on-highway* HDDEs. 40 C.F.R. §§ 1068.30 (defining date of manufacture); 1068.1(b) (§ 1068 does not apply to HDDEs). Because Navistar chose to rely on regulations that clearly did not apply to its engines and continued production on the engines well into 2010, it failed to comply with the applicable *on-highway* regulations at 40 C.F.R. § 85.2305(a-d), located in the section explicitly for HDDEs. Navistar Response to 208 Information Request (Feb. 4, 2011) ("NAV. 208 Resp."); (Exh. H to United States' Motion for Partial Summary Judgment on Liability); Opp. Br. at 15.

---

[6] If there actually was a dispute about this fact, Navistar would have said so in its response to the statement of facts or in its brief. The absence of such a straight forward statement is telling.

Navistar's introduction of the Subject Engines into commerce without a valid COC gives rise to 7,749 violations of Section 203(a)(1) of the Act, for which the United States seeks injunctive relief and civil penalties.

## II. ON-HIGHWAY REGULATIONS CLEARLY ESTABLISH WHAT ENGINES ARE COVERED BY A CERTIFICATE OF CONFORMITY

Despite Navistar's attempts to make the regulatory regime seem ambiguous, it is clear. Under the clear governing regulations, the Subject Engines were not covered by their MY2009 COCs. Navistar's claim that the on-highway regulations are unclear is entirely based on the regulations' failure to explicitly define the term "produced," even though they do define "first produced." Navistar's narrow and strained argument ignores the clear instruction the on-highway regulations provide regarding the duration and applicability of COCs and unreasonably seeks to create a different definition for the word "produced" than the definition provided for that word in the phrase "first produced." Navistar's reliance on inapplicable nonroad regulations is misplaced.[7]

### A. The Regulations and Facts Demonstrate that Navistar's Subject Engines Were Fully Assembled, and Thus Produced, in 2010 and are Not Covered by Navistar's Model Year 2009 COCs.

For the question of regulatory interpretation at bar, the Court must first decide whether it is clear from the text of applicable regulations that the Subject Engines were not covered by a COC. *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 710 (7th Cir. 2005). The United States submits that the regulations are clear.

---

[7] Because the crux of the case is whether the regulations are clear, the United States attaches the relevant regulations at Exhibit A. Moreover, Navistar repeatedly accuses the United States of playing "fast and loose" and misrepresenting the text of regulations. Reference to the language of the text will show that the United States has accurately explained the law.

All new motor vehicle engines must be covered by a COC before introduction into commerce. 42 U.S.C. § 7522(a)(1). COCs cover an *engine family*, which is a group of engines built in the same Model Year that have similar emissions and physical characteristics. 40 C.F.R. § 86.096-24(a)(1)–(2). To obtain a COC, a manufacturer must submit an application with a detailed description of, among other things, the engines, their emission control system, fuel system, and emission-related components. *See* 40 C.F.R. § 86.094-21(a)–(b)(3) (partially describing required content of an application for a COC); *see also* 40 C.F.R. Part 85 App. VIII(C) (listing heavy duty diesel engine parameters and specifications). If the COC application, including required testing data, demonstrates that the engine family described will comply with emissions standards for the named Model Year, a COC covering the engine family for that Model Year is issued. 42 C.F.R. § 7525(a)(1); *see* 40 C.F.R. § 86.007-30 (standard for issuing COC for motor vehicles or motor vehicle engines).

For HDDEs, such as those at issue here, the regulations that define Model Year describe its beginning and end, and specify the duration and applicability of COCs, are found at 40 C.F.R. §§ 2301–2305.[8] *Model Year* refers to a manufacturer's *annual production period*, or if the manufacturer has no annual production period, a calendar year. 40 C.F.R. § 85.2302. *See also* 42 U.S.C. § 7521(b)(3)(A)(i). A Model Year can only include the January 1 of a single calendar year, (40 C.F.R. § 85.2302), and it is named for the calendar year of the January 1 it includes, (40 C.F.R. § 85.2303). A Model Year *must end* by December 31 of the named Model Year. 40 C.F.R. § 85.2305(d).

---

[8] "The definitions provided by this subpart … *apply to all* … heavy-duty motor vehicles and *heavy-duty engines used in motor vehicles* … as such vehicles and engines are regulated under … Title II Part A of the Clean Air Act." 40 C.F.R. § 85.2301 (emphasis added). As discussed further below in Section C, the off-road regulations on which Navistar seeks to rely contain a similarly explicit provision that they do *not* apply to HDDEs. 40 C.F.R. § 1068.1(b).

The regulations at § 85.2305 that describe the duration and applicability of HDDE COCs provide that COCs "cover the vehicles or engines named in such certificate and produced during the *annual production period*, as defined in § 85.2304." 40 C.F.R. § 85.2305(a) (emphasis added). "Vehicles or engines produced after December 31 of the calendar year for which the model year is named are not covered by the certificate of conformity for that model year." *Id.* at § 2305(d). A new COC must be sought for engines produced after that date, certifying compliance with "currently applicable" standards (*i.e.*, the next year's standards). *Id.*

For on-highway engines, the *annual production period*, as well as the Model Year (since it is defined to mean "the manufacturer's annual production period"), begins when any engine in an engine family is "first produced," 40 C.F.R. §§85.2302, 85.2304(a), "or on January 2 of the calendar year preceding the year for which the model year is designated, whichever date is later." 40 C.F.R. § 85.2304(a). The date when an on-highway engine is *first produced* is known as the "Job 1 date," [9] which refers to the "date on which a manufacturer completes all manufacturing and assembling processes necessary to produce *the first saleable unit* of the designated model which is *in all material respects* the same as the vehicle or engine described in the manufacturer's application for certification." 40 C.F.R. § 85.2304(b). In other words, that *first saleable unit* has to be *materially identical* to the engine described in the COC application. It must be fully built in accordance with the descriptions in the COC application, not merely contain a crankshaft installed in the engine block, as Navistar claims. Opp. Br. at 10.[10]

---

[9] The terms Job 1 date and first produced are not used to determine nonroad engine Model Years. Instead, nonroad Model Years are based on the *date of manufacture*. 40 C.F.R. § 1068.30 ("the date on which the *crank shaft is installed in an engine block. . . .*").

[10] COC applications for on-highway engines require a detailed description of a complete engine, (C.F.R. § 86.094-21(a)–(b)(1)(i)), including detailed drawings of emissions components and explanatory information about the engine family's emission control, fuel, onboard diagnostic, and exhaust-gas recirculation control systems, as well as auxiliary emission control devices,

To be covered by the COC issued for its Model Year, each subsequent engine must be produced during the production period and be materially identical to the engine described in the COC application. 40 C.F.R. § 85.2305(a), (d); *see United States v. Chrysler Corp.*, 591 F.2d 958, 960 (D.C. Cir. 1979) ("[A] certificate of conformity 'covers only those new motor vehicles which conform, in all material respects, to the design specifications that applied to those vehicles described in the application for certification.' 40 C.F.R. § 85.074-30(a)(2) (1976)").

Navistar argues that the regulations are not clear only because they do not define the word "produced," just the term "first produced." *See* Opp. Br. at 4, 14. Navistar seeks to create confusion where none exists. Common sense dictates that after defining when an engine is "first produced" each engine thereafter is also "produced" when the manufacturer completes the assembling processes necessary to produce a saleable unit that is in all material respects the same engine as described in the COC. The definition of annual production period is fully consistent with the understanding that "first produced" refers to the first event in a series because it references both the date when an engine "is first produced" and "when the last such . . . engine is produced . . . ." 40 C.F.R. § 85.2304(a).

When these regulations are applied to the facts of this case, it is clear the Subject Engines were not covered by a COC. Navistar admits that the manufacturing of the Subject Engines was not complete before December 31, 2009. *See* Argument Section I; NAV SOF ¶¶ 23–29. Because Navistar failed to complete the Subject Engines by December 31, 2009, they

---

physically adjustable parameters, and the engine family's primary intended service class. *See* 40 C.F.R. §§ 86.007-21(a), (b)(1)–(3), (b)(5)(ii), (h), (o), (p)(2). Therefore, to identify a Job 1 Date and the start of a Model Year, on-highway manufacturers have to build an engine complete enough to contain all COC application specifications (only some of which are listed above). *See* 40 C.F.R. § 85.2304(b). No HDDE manufacturer could make this demonstration early in the production process, when only a crankshaft had been inserted into an engine block.

were not produced during the Model Year 2009 annual production period and were completed too late to be covered by a MY2009 COC according to the plain text of 40 C.F.R. §§ 85.2301, 2304, and 2305. Thus, they were not covered by any COC.

### B. Navistar's Description of 40 C.F.R. Part 85 Subpart X as Applying Only to Section 177 of the Act is Categorically False.

Navistar argues that 40 C.F.R. 85 Subpart X[11] is inapplicable to the Subject Engines. Opp. Br. at 8. While headings do not carry the force of law, it is nevertheless telling that Navistar found it necessary to omit a significant portion of the title of Subpart X to support its argument. In full, it reads: "Determination of Model Year for Motor Vehicles and Engines Used in Motor Vehicles Under Section 177 *and Part A of Title II* of the Clean Air Act." (emphasis added). More importantly, the applicability of Subpart X to HDDEs' compliance with the Clean Air Acts' COC requirements is provided by the text of the legally binding regulation itself. *See* 40 C.F.R. § 85.2301 ("definitions . . . apply to . . . heavy duty engines used in motor vehicles"). The Federal Register notice Navistar cites also clearly states that 40 C.F.R. 85 Subpart X applies to Title II, Part A of the Act: "EPA is also proposing to apply these regulations to 'model year' as that term is used for regulation of motor vehicles under Part A of Title II of the Act. EPA is not proposing to extend this determination at this time to regulation of nonroad engines and vehicles, which may require somewhat different provisions for 'model year.'" 59 Fed. Reg. at 48697.

Navistar claims that 40 C.F.R Part 85 Subpart X does not apply to the Subject Engines because it was drafted to clarify "confusion regarding the commencement of a model year." Opp. Br. at 8–9. But EPA had other reasons for drafting Subpart X. As EPA explained in the preamble, Subpart X was also drafted to ensure that its "proposed model year regulations, which apply to section 177 and Title II, retained the definition of 'model year' . . . as essentially 'the

---

[11] 40 C.F.R. 85 Subpart X includes every regulation from Section 2301 through 2305.

manufacturer's annual production period.'" *See* 60 Fed. Register 4712, 4732 (Jan. 24, 1995).

Moreover, Navistar's argument ignores the plain language of the regulations themselves. 40

C.F.R. § 85.2305(a) states that "a [COC] is deemed to . . . cover the vehicles or engines named in

such certificate and produced during the annual production period, as defined in § 85.2304." 40

C.F.R. § 85.2304 defines "annual production period" based on when an engine is "first

produced." Thus, Navistar's argument that 40 C.F.R. Part 85 Subpart X does not address when

an on-highway engine is produced is not correct.

### C. Navistar's Arguments About 40 C.F.R. § 1068 Do Not Undermine the Plain Language of Part 85.

Notwithstanding explicit regulatory language to the contrary, Navistar insists that several

sections of 40 C.F.R. Part 1068 should apply to its on-highway HDDEs. But 40 C.F.R.

§ 1068.1(b) explicitly excludes the use of Part 1068 when manufacturing HDDEs: "(b) *This part

does not apply* to any of the following engine or vehicle categories . . . (2) *Heavy-duty motor

vehicles and motor vehicle engines* (*see* C.F.R. part 86)." 40 C.F.R. § 1068.1(b). This facial

prohibition against the use of Part 1068 by HDDE manufacturers could not be clearer. Indeed,

Navistar admits that Section 1068.103 did not "literally appl[y]" in 2009. Opp. Br. at 15, 17.

Navistar's reliance on the nonroad term "date of manufacture," as defined by Part 1068, to

determine the Model Year for its engines is also improper. The differences between the nonroad

and on-highway regulatory scheme support this conclusion. Navistar's citation of a rule change

EPA *proposed* in 2015 (but never promulgated) is irrelevant and misleading.

### i. *40 C.F.R. Part 1068's Regulatory Scheme is Tailored to the Type of Engines it Covers, Not HDDEs*

On-highway regulations define a *heavy-duty engine* as "any engine which the engine

manufacturer could reasonably expect to be used for motive power in a heavy-duty vehicle." 40

C.F.R. § 86.082-2; *see* 42 U.S.C. § 7550(2) (defining *motor vehicle* as a vehicle that is self-

propelled and designed to be used for transportation on a street or highway). While the hallmark of a motor vehicle engine under the on-highway regulations is whether it is capable of providing *motive power*,[12] in 2008 EPA adopted a different system for nonroad engines which may be used in either nonroad vehicles or nonroad equipment. *See* 42 U.S.C. § 7550 (defining *nonroad engine* as an internal combustion engine not used in a motor vehicle); 59 Fed. Reg. 31306, 31314 (June 17, 1994) ("The Act provides equal authority to regulate off-highway mobile cranes, which are nonroad vehicles, and lawnmowers, which are nonroad equipment.").

Recognizing that nonroad engine manufacturers sometimes produce nonroad engines for specific applications by modifying complete or partially complete engines obtained from other manufacturers, EPA promulgated a definition of nonroad *engine* in 40 C.F.R. Part 1068 that would subject both complete and partially complete nonroad engines to regulation. 73 Fed. Reg. 59034, 59131 (Oct. 8, 2008). With the new definition of nonroad *engine*, EPA also adopted regulations changing how the duration and applicability of nonroad COCs are determined, in part to provide certainty for manufacturers of large nonroad engines with lengthy assembly times or that are "assembled in multiple stages at different facilities." *Id.* at 59133. Thus, the term date of manufacture in nonroad regulations is tied to the nature of nonroad engines themselves and further illustrates on-highway HDDEs' intentional exclusion from 40 C.F.R. Part 1086.

> ## ii. *Navistar's Claim That "In 2008, EPA Did Define an Engine's 'Date of Manufacture' as the Date a Crankshaft is Installed in the Engine Block" is Misleading.*

Navistar states that "the only regulations that define date of manufacture define it as crank-in-block." Opp. Br. At 1. But the term "date of manufacture" is used to determine Model Year only in the nonroad context. Indeed, in discussing Model Year determinations for on-

---

[12] *See* Argument Section III (discussing history of EPA regulatory interpretation).

highway engines, much of Navistar's Opposition incorrectly refers to the inapplicable term "date of manufacture" instead of the applicable question of when an engine is "first produced." 40 C.F.R. § 85.2304(b) (2009). Such misapplication of the law raises no genuine issues of material fact and cannot defeat summary judgment.

Although, as Navistar argues, the term "date of manufacture" is used in 40 C.F.R. Part 85, it is only used twice, first, in a provision related to record-keeping that Navistar does not even cite, 40 C.F.R. § 85.1906(b), and second, in a provision requiring manufacturers to include the manufacturing date on engine labels.[13] Neither use even purports to change the determination of an on-highway engine's model year. Navistar has read the term date of manufacture into regulations where it does not exist and given a meaning that it does not have in the on-highway context.

### iii.    And Defendants Knew That Part 1068 Did Not Apply to HDDEs

Not only are the regulations at Part 1068 clear that they do apply to on-highway HDDEs, Navistar knew that they did not apply to the Subject Engines. On September 30, 2008, David Piech, a Navistar employee sent the text of the proposed nonroad rule to Sergio Sgarbi, another Navistar employee. Mr. Piech set forth the text of the proposed definitions of "date of manufacture" and "engine" from Part 1068, but prefaced his email with, "From the proposed *Non-road rule (there is no similar definition for on-highway*, but this can be used as guidance)…." Decl. of Cary R. Perlman, Ex. G (Email from David A. Piech to Sergio Sgarbi dated September 30, 2008). Approximately a month later, Mr. Piech notified Mr. Sgarbi that the non-road rule including the definition of an engine and date of manufacture had been approved.

---

[13] *See* 40 C.F.R. § 86.095-35: "(D) Date of engine manufacture (month and year). The manufacturer may, in lieu of including the date of manufacture on the engine label, maintain a record of the engine manufacture dates. The manufacturer shall provide the date of manufacture records to the Administrator upon request."

Mr. Piech confirmed that Navistar understood these definitions did not apply to their engines – "*Although non-road*, that definition will likely be used for on-road." Perlman Decl, Ex. F (Email from David A. Piech to Sergio Sgarbi dated October 31, 2008). These statements show beyond a doubt that Navistar was well aware that Part 1068 applied to nonroad, not on-highway, engines.

      *iv.*      ***Proposed Revisions to Regulations in 2015 are Irrelevant to Navistar's 2009 Violations.***

Navistar argues that its reliance on 40 C.F.R. Part 1068 in 2009 was proper because in 2015 EPA proposed a change to the law. Opp. Br. at 2, 10, 16. However, as of the date of filing, no such rule change has occurred. But even if a rule change occurs tomorrow, it is irrelevant to the law at the time of Navistar's violations. Navistar claims that the preamble to a rule-making proposed in 2015 ("2015 preamble") confirmed that EPA always interpreted the word "produced" to mean when crankshafts are installed in engine blocks for HDDEs. Opp. Br. at 2, 10, 16. Navistar's argument is incorrect. First and foremost, the proposed rule is irrelevant because it was never adopted. Furthermore, while it is true that EPA's proposed rule change would have made the definitions of "engine" and "date of manufacture" in 40 C.F.R. § 1068.30 applicable to all HDDEs, 80 Fed. Reg. 40138, 40527 (July 13, 2015), when the statements from the 2015 preamble Navistar cites are put into context, they do not support Navistar's argument.

First, Navistar's claim that EPA's 2015 proposal did not involve substantive changes to the provisions relevant to this case is misleading. Opp. Br. at 2. While EPA wrote that it "expects the following provisions from 40 CFR Part 1068 to not involve a substantive change for heavy-duty highway engines," 80 Fed. Reg. at 40526, the referenced provisions from "Part 1068, Subpart A" that EPA expected would "not involve substantive change" included topics like how EPA handles confidential information and how the administrator may delegate decision-making.

80 Fed. Reg. at 40526. EPA did not state that the definition of when a nonroad engine is "manufactured" had always applied to on-highway engines.

Second, contrary to Navistar's suggestion, the reference to Subpart A in EPA's list does *not include* the definitions of "engine" and "date of manufacture" in 40 C.F.R. § 1068.30. Indeed, after EPA listed the non-substantive changes discussed above, the 2015 preamble states that EPA proposed to make the definitions of "engine" and "date of manufacturer" mandatory for all HDDE manufacturers. *Id.* In other words, EPA acknowledged that these definitions are substantive changes because they would not have applied to on-highway HDDEs in 2009.

Third, Navistar's reliance on the 2015 preamble's "generally mirrors" language to support its argument about crankshaft installation is equally misplaced because it ignores the exception in the "generally mirrors" language. Opp. Br. at 16. While 1068.103 discusses crankshaft installation in 40 C.F.R. § 1068.103(f), a stockpiling provision, EPA's 2015 preamble expressly excludes 40 C.F.R. § 1068.103(f) from the proposed list of non-substantive changes. EPA never suggested that crankshaft installation had any bearing on the determination of an on-highway engine's model year. To the contrary, these preambles show that EPA's interpretation of the regulatory requirements is consistent with its position in this case.

### III. WHILE THE REGULATIONS AT ISSUE ARE CLEAR, IF THIS COURT FINDS OTHERWISE, IT SHOULD DEFER TO EPA'S CONSISTENT INTERPRETATION OF THE REGULATIONS.

If this Court finds EPA's regulations are not ambiguous, then it should apply their plain meaning. *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000). If, on the other hand, this Court finds the regulations to be ambiguous, then it should defer to EPA's longstanding interpretation of the regulations that a COC covers only those engines that are built to the specifications in that certificate during the relevant annual production period. An agency's interpretation of its own *ambiguous* regulations is controlling unless it (1) is plainly erroneous or

inconsistent with the regulation or (2) does not reflect the agency's fair and considered judgment

on the matter in question. *See Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2166

(2012); *Auer v. Robbins,* 519 U.S. 452, 461–62 (1997). While Navistar's brief never uses the

word "deference," Navistar argues at length that EPA's interpretation of the regulations is

inconsistent with EPA's prior interpretations. *See, e.g.*, Opp. Br. at 4–5, 8–9, 20–21. In doing so,

Navistar tacitly argues that the Court should not afford EPA's interpretation any deference.[14]

Navistar's argument fails and EPA's interpretation controls because EPA has consistently taken

the same position regarding the meaning of the relevant regulations.[15]

## A. EPA's Longstanding Interpretation of the Relevant Regulations Reflects EPA's Fair and Considered Judgment

EPA's interpretation of the language at issue has been consistent since at least 1989, and

EPA's interpretation reflects the considered judgment of the agency. Recently, the Seventh

Circuit found that an agency's interpretation of a regulation reflected the agency's fair and

considered judgment on a question where the agency took a consistent interpretation of the

regulation since 1992. *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 651 (7th Cir.

2015). A longer history of consistency in this case establishes that EPA's interpretation of the

regulations at issue reflects EPA's fair and considered judgment.[16]

On three occasions since the relevant language went into effect, EPA expressed its

considered judgment on the regulatory requirements for HDDEs. The language of the relevant

---

[14] Navistar often frames is argument about EPA's regulatory guidance in terms of Navistar's "reasonable" reliance. *E.g.*, Opp. Br. at 15. But the reasonableness, or lack thereof, of Navistar's reading of regulatory guidance is irrelevant because the Act is a strict liability statute. *See* 42 U.S.C. § 7522(a) (prohibiting enumerated acts without reference to *mens rea* requirement).

[15] While Navistar makes a variety of arguments that can be construed as falling within the second exception to the rule providing controlling weight to an agency's interpretation of its regulations, Navistar never suggests that EPA's interpretation is plainly erroneous or is not a possible reading of the regulations. For that reason, this brief limits itself to the second exception.

[16] The EPA guidance discussed in this Section is attached herein as Exhibits C–E; G–H.

regulations has been in effect since 1987 when EPA published Advisory Circular 6B.[17] This Circular included provisions with language that is nearly identical to the language used to define "annual production period" at 40 C.F.R. § 85.2304(a) and to limit the coverage of COCs to engines produced during the annual production period at 40 C.F.R. § 85.2305. At the time, EPA believed this Advisory Circular had the power of law and as such, was controlling (that view on deference was later called into question by the First and Second Circuit). *See* 59 Fed. Reg. at 48697 (discussing *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 864–866 (1984). Thus, EPA's interpretation of the governing law after 1987 includes interpreting COC coverage requirements that are identical to those provided in 40 C.F.R. § 85.2304(a) and 40 C.F.R. § 85.2305.

In 1989, EPA interpreted the relevant requirements. EPA explained: "[W]hoever completes the [group of parts] into a motor vehicle engine by adding the missing components would be considered a manufacturer of new motor vehicle engines, and as such, would be *required to certify the completed engine* to present model year federal emission standards." 1989 Mitsubishi Letter, Exh. D. In 1990, EPA reiterated that whoever "*completes* the 'three-quarter block' into a *complete engine* by installing the missing components must *either certify* the engine to comply with the emission requirements *for the model year of final assembly* or *complete* the

---

[17] Even before Circular 6B made the current language applicable, EPA provided the same view of the regulations to Navistar (known then as International Harvester) in 1981. *See* Exh. F (Form 8K showing International Harvester became NIC). In that letter, EPA explained to Navistar that engines must be *certified for the model year of final assembly or must be completed into a previously certified configuration for the current model year*. Exh. F at 2. This guidance is completely consistent with EPA's interpretation of the applicable on-highway regulations found at 40 C.F.R. Part 85.

engine *into a previously certified configuration* meeting all applicable Federal emission requirements of *the current model year . . . .*" 1990 Mitsubishi Letter, Exh. E.[18]

These letters make two points clear. A manufacturer who complete an on-highway engine must certify it. Second, if an incomplete on-highway engine is not completed during the current Model Year, the only option available to whoever completes the engine is to certify that the newly completed engine complies with the emission requirements for the Model Year of final assembly.

In 1994—the year before promulgation of 40 C.F.R. Part 85 Subpart X—in its response to comments on the proposed rule, EPA repeated its explanation of the meaning of Model Year and the consistency of the proposed rule with prior practice:

> Moreover, the definition of model year that EPA is adopting retains the definition in the Act and in existing EPA regulations, supplemented by the definition of 'annual production period,' which has appeared in various versions of EPA Advisory circulars on this issue since 1972. *The definition does not constitute a shift in Agency policy.*

Ozone Transport Commission Summary and Analysis of Comments at 7 (Dec. 1994), Exh. G (emphasis added). Responding to a request that it clarify the date a vehicle is *first produced*, EPA referred to the concept of the Job 1 date and emphasized that identifying the Job 1 date as the date of first production was consistent with the Agency's prior guidance:

> This provision, called "Job 1", can be considered the point in time at which the manufacturer completes all manufacturing and assembling processes necessary to produce the first saleable unit of the designated model which is in all material respects the same as the vehicle or engine described in the manufacturer's Application for Certification. The Job 1 date, therefore, was the date when the first prototype unit of a model within an engine family comes off the assembly line . . . .

> Therefore, EPA has added an appropriate definition for the "commencement of production period" to the model year regulations which is based on the definitions

---

[18] EPA made the content of these letters publically available and referred to them as providing its long-held policy in the preamble to a 1996 rule.  *See* 61 Fed. Reg. 58102, 58104 (Nov. 12, 1996).

of Job 1 from EPA's prior Advisory Circulars on model year. *Id.* at 27.

## B. Navistar's Arguments About the Federal Register Notices in 2008 and 2015 Do Not Show Inconsistency by EPA.

Navistar's two arguments regarding the Federal Register notices published after 2007 do not establish that EPA took an inconsistent position. First, Navistar contends that the preamble to the rulemaking that created the definitions of "engine" and "date of manufacture" in 40 CFR Part 1068 supports applying those definitions to HDDEs. Opp. Br. at 15. In doing so, Navistar selectively quotes the few sentences of that preamble favoring its argument while ignoring the extensive portions explaining that the rules in 1068 apply to nonroad engines. *See* 73 Fed. Reg. 59034, 59049-51, 59063-64, 59075-77. Moreover, this rulemaking also promulgates 40 C.F.R. § 1068.1(b), which expressly excludes HDDEs from 40 C.F.R. Part 1068's general scope. *Id.* at 59345.

Second, Navistar argues that the preamble to a rulemaking proposed in 2015 confirms that EPA has interprets the word "produced" to mean when crankshafts are installed in engine blocks for HDDEs. Opp. Br. at 2, 10, 16. To be sure, EPA proposed a change to the rules that would make the definition of engine and date of manufacture in 40 C.F.R. § 1068.30 applicable to all HDDEs. 80 Fed. Reg. 40527. But this change was proposed several years after Navistar's violations, and shows that EPA did not view it to be the current rule. Accordingly, these preambles show that EPA's interpretation of the regulatory requirements is consistent with its position in this case. And EPA's consistent interpretation that a COC covers only those engines that are built to the COC specifications during the relevant annual production period is owed deference. For the foregoing reasons, this Court should grant summary judgment to the United States.

## C. Contrary to Navistar's Suggestion, the Mitsubishi Letters are Not Inconsistent.

Navistar argues that EPA's response to the Mitsubishi Letters shows that it has been inconsistent about what constitutes a new motor vehicle engine. Opp. Br. at 5. This argument seeks to create an inconsistency by telling less than the whole story. EPA has a longstanding policy of preventing engine manufacturers from evading regulation through industrial slight-of-hand. In 1971 the EPA stated:

> Congress was concerned basically with engines capable of operation. However, we cannot think that the Congress intended that manufacturers who build what in almost every respect is a complete engine should be allowed to escape Federal emission control regulation by the simple expedient of leaving unattached one readily added functional component . . . . Absent express language indicating congressional intent to create such a loophole, we believe that the administering agency has the discretion to see that it does not exist.

Exh. J, Opinion of the U.S. Environmental Protection Agency's Office of General Counsel, *Certification of Three-Quarter Engines* (Aug. 13, 1971); *see* 42 U.S.C. § 7521(a) (directing EPA to prescribe emissions standards for new motor vehicles or engines); *see also* 42 U.S.C. § 7550(2) (defining *motor vehicle* as "any self-propelled vehicle designed for transporting persons or property on a street or highway."). In 1972, EPA promulgated a definition of "heavy duty engine" (still in effect today) which included not only fully functional engines but also engines "manufacturer could reasonably expect to be used for motive power in a heavy-duty vehicle . . . ." 40 C.F.R. § 86.082-2.

In 1989, Mitsubishi asked whether a set of parts it called a "long block" was a "new motor vehicle engine. 1989 Mitsubishi Letter, Exh. D. After providing the definition of heavy duty engine above, EPA explained that the proposed long block only lacked "components that are insignificant when compared to the lengthy list of components included with the 'long block.'" Because those components could be easily added to make it a source of motive power in

a heavy duty vehicle, EPA found the long block to be a "new motor vehicle engine" requiring certification before introduction into commerce.

In 1990, EPA again explained when an engine is "sufficiently complete" and subject to certification requirements. 1990 Mitsubishi Letter, Exh. E. This time, the engine was a "three-quarter block," which "lacks an alternator, a starter, a fuel injection pump, a flywheel and several lesser components." Notably, the three-quarter block includes a crankshaft in an engine block. EPA looked to whether the engine was capable of motive power and concluded that the three-quarter block was not a source of propulsion and therefore, was not a new motor vehicle engine requiring a COC. Thus, the difference between these two letters is EPA's determination of whether the parts at issue could easily be turned into a source of motive power for a heavy duty vehicle.

Navistar cites these letters for the proposition that EPA provided different answers to the question what constitutes a new motor vehicle engine. Opp. Br. at 5. This arguments is unavailing because the letters show that EPA has always identified the point in time in which an HDDE requires certification in reference to when it can be reasonably expected to be capable of motive power. The letters are also consistent with EPA's concern that the industry will try to sidestep regulation by selling nearly complete engines without certification. EPA's concern is also reflected in the 40 C.F.R. § 85.2304 definition of "Job 1 date" and "first produced," which emphasizes completion of a finished, saleable unit. Like the three-quarter block described in EPA's 1990 response to Mitsubishi, Navistar's engines containing only a crankshaft in the engine block cannot reasonably be expected to be capable of motive power, and therefore are not complete engines that could be certified.

## IV. THE DELEGATED ASSEMBLY EXEMPTION DOES NOT SUPPORT AN ARGUMENT THAT NAVISTAR'S ENGINES ARE COVERED BY THE MODEL YEAR 2009 COC.

For the reasons set forth below, it is unnecessary for the Court to resolve the Parties' dispute regarding what the effective Delegated Assembly Exemption ("DAE") provided in 40 C.F.R. § 85.1713. Resolution of this would not change the fact that Navistar produced the Subject Engines too late. By its terms, the current version of 40 C.F.R. § 85.1713, published in late 2008, only created the DAE starting with Model Year 2010. As the United States asserted in its motion, the omission of language expressly establishing the DAE for Model Year 2009 was an oversight. *See* Exh. B, Declaration of Alan Stout, ¶ 5.

As the United States contends, the version of 40 C.F.R. § 85.1317 in 2008 was still in effect in 2009—indeed, Navistar opted into the DAE for two of the Subject Engine families, *see Subject Engine* COC Applications, Exh. B to United States' Motion for Partial Summary Judgment on Liability—yielding the result that a manufacturer must use the date when an engine is fully assembled, except for the after treatment device, to determine the engine's model year. Because the Subject Engines were not fully assembled in this way, they were not covered by the MY2009 COCs.

For its part, dismissive of EPA's assertion of a clerical error, Navistar asserts that the earlier version of 85.1713 did not appear in the 2009 C.F.R., "because it was not in effect that year," Opp. Br. 23, notwithstanding the fact that it purported to use the exemption. Moreover, although it would require the Court to enforce a regulation that – on its face – was not effective until the next Model Year (MY2010), the result under the DAE published in October 2008 is the same. *See* United States' Memo. in Support of Partial Summary Judgment on Liability at 5, n 6.

## V. NAVISTAR IS NOT ENTITLED TO DISCOVERY UNDER RULE 56(D) BECAUSE THE DOCUMENTS IT SEEKS COULD NOT CREATE A GENUINE ISSUE OF MATERIAL FACT.

This Court should reject Navistar's request for additional discovery to search for EPA communications about inconsistent interpretations of the applicable regulations. This is because: (1) the regulations at issue are clear; (2) Navistar seeks information which cannot be relied upon to answer the only question at issue; and (3) Navistar has presented nothing to suggest the discovery it seeks could defeat summary judgment.

Rule 56(d) "is not a shield that can be raised to block a motion for summary judgment *without even the slightest showing by the opposing party that his opposition is meritorious*." *OneBeacon Ins. Co. v. U.S. Foods, Inc*, 304 F.R.D. 536, 539 (N.D. Ill. 2014). Therefore, to succeed under Rule 56(d), Navistar must show "what additional facts would be necessary to avoid summary judgment, and demonstrate that the new discovery would succeed in defeating the summary judgment motion." *See Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012); *see also*, *Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 14 F. Supp. 3d 1217, 1239–40 (S.D. Ind. 2014), *opinion corrected on denial of reconsideration*, No. 1:11-CV-01031-SEB, 2015 WL 179569 (S.D. Ind. Jan. 14, 2015), and *aff'd sub nom*, *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068 (7th Cir. 2016). Navistar's showing may not be based solely on speculation and must include an explanation for how the discovery sought could create a genuine issue. *Spierer v. Rossman*, No. 1:13-CV-00991-TWP, 2014 WL 4908023, at *5 (S.D. Ind. Sept. 30, 2014), *aff'd*, 798 F.3d 502 (7th Cir. 2015). Indeed, Rule 56(d) cannot be used in "hope[s] of finding a proverbial 'smoking gun'" and motions "based on nothing more than mere speculation [that] amount[s] to a fishing expedition" should be denied. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 885 (7th Cir. 2005) (denying a Rule 56(d) motion that failed to set forth

any specific evidence that the discovery sought would create a genuine issue of material fact). Navistar's speculative and unsupported motion falls short of Rule 56(d)'s requirements.

First, if the Court finds that the regulations are clear, Navistar's Rule 56(d) motion is moot because EPA's regulatory interpretation—both official and unofficial—becomes irrelevant. *See Christensen v. Harris County,* 529 U.S. 576, 588 (2000). Second, if the Court finds the regulations are unclear, it still cannot consider what Navistar seeks because "[c]ourts may not…rely on unpublished opinions of agency staff." *United States v. Farley*, 11 F.3d 1385, 1390 (7th Cir. 1993)(citing *Chevron*, 467 U.S. at 864–866; *International Paper Co. v. Federal Power Comm'n,* 438 F.2d 1349, 1358–1359 (2d Cir.1971), *certiorari denied*, 404 U.S. 827) ("views of individual members of the [agency's] staff are not legally germane."); *see also R.T. Vanderbilt Co., Inc. v. U.S.*, 2010 WL 2706282 *2, A.F.T.R.2d 2010-5171 (FC July 8, 2010) ("courts may not rely on unpublished opinions of agency staff in deciphering the meaning of a statute or regulation").

Third, to the extent Navistar seeks official, published EPA interpretations of regulations not already in its possession (or otherwise accessible),[19] it has not met its burden to prove that its requests are based on anything more than speculation: "EPA communications…*ignoring* the on-highway regulations EPA relies on in this litigation similarly will disprove Plaintiff's contention that those regulations apply, much less that they are 'clear.'" Opp. Br. at 27; Exh. I, Dahl Decl. ¶ 17; *see Spierer v. Rossman*, 2014 WL 4908023, at *5. Indeed, Navistar also uses Rule 56(d) as a catch-all for any other documents that might exist to support its defenses: "I could pose more

---

[19] The United States maintains its objections to Navistar's RFPS. To the extent the company seeks EPA's public and official guidance about the meaning of relevant regulations and statutes, Navistar has access to them. *See* United States' Response to Navistar's First Round of Requests for Productions.

examples, but Navistar is at a disadvantage not of its making because the documents that undercut the Plaintiff's motion are precisely the documents that Plaintiff has not produced." Exh. I, Dahl Decl. ¶ 17. This is impermissible speculation and an improper request for a 56(d) motion. *Spierer v. Rossman*, 2014 WL 4908023, at *5.

Navistar does not explain why there is any reason to believe there are any official interpretations that it does not already have. Rather than setting forth specific evidence and explaining how it could create a genuine issue of material fact, Navistar recites a handful of its requests for production and concludes that somewhere among the documents it requests there may be a smoking gun. This is not permissible. *Davis v. G.N. Mortg. Corp.*, 396 F.3d at 885. Given the historic consistency of EPA's official regulatory interpretations, including voluminous preambles, published guidance, and publicly available "dear manufacturer" letters, there is no reason to think discovery would uncover anything that would change this Court's interpretation of the regulations, and Navistar surely provides no basis to suspect otherwise.

The discovery Navistar outlines in its Rule 56(d) declaration is irrelevant to liability, and perhaps only peripherally relevant to penalty. Therefore, while discovery for the liability phase has begun in this case, it need not continue.

### A. The Overbroad Discovery Sought by Navistar Illustrates That No Genuine Issues of Material Fact Exist.

Navistar argues that it has been prejudiced by the United States' failure to produce documents more quickly. The Defendant implies that it needs discovery to defend itself against summary judgment, but only requests one small subset in its Rule 56(d) Declaration. This fact alone proves Navistar does not need all the discovery its Opposition discusses to defend summary judgment, and the discovery requested highlights the lack of material facts present in this case. For example, Navistar requests information to undermine the plain meaning of

applicable regulations. Opp. Br. at 26–27. Not only is this discovery irrelevant because the regulations are clear on their face, but even if the Court resorts to analysis of agency interpretation, it has also been consistent for decades. *See* Argument Section III. Unofficial EPA communications about the regulations are irrelevant to Navistar's liability and beyond the Court's consideration for legal interpretation. *Farley*, 11 F.3d 1385, 1390. Whether EPA has taken enforcement action against other manufacturers for similar conduct also does not preclude summary judgment. Exh. I, Dahl Decl. at ¶ 17. The agency "has broad discretion to choose how best to bring an enforcement action." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007). At best, this may be relevant to penalty.

### B. Navistar is Incorrect in Asserting That the United States Has Conceded That the Discovery Navistar Now Seeks is Relevant To Liability.

Navistar alleges that the United States agreed that the discovery Navistar now seeks is relevant to liability. Opp. Br. at 27. The transcript Navistar cites in support of this allegation is taken out of context; it relates to bifurcation and occurred weeks before the United States was served with Navistar's discovery requests. It is unreasonable to suggest that the United States would concede that all the documents Navistar might ever request are relevant, (let alone sufficient to create genuine issues of material fact), at a preliminary scheduling hearing before discovery was served. Further, binding law in the Seventh Circuit limits the use of many requested documents (*see*, *Farley*, 11 F.3d at *1390).

Even if the United States conceded relevance, what is relevant for the purposes of discovery generally is much broader than what is necessary to establish a genuine issue of material fact. This point is well illustrated by Navistar's own Rule 56(d) Declaration, which requests a narrow version of only one of the ten bullets mentioned in the cited transcript. *See* Exh. I, Dahl Decl. at ¶ 17.

## VI. NAVISTAR HAD FAIR NOTICE OF THEIR OBLIGATIONS UNDER LAW THAT HAS NOT SUBSTANTIVELY CHANGED IN DECADES.

Navistar claims that it lacked fair notice of the regulations applicable to the Subject Engines due either to EPA's alleged creation of a "completely assembled" rule just for this case or EPA's allegedly novel interpretation of already existing regulations. Opp. Br. at 23–26. As a threshold matter, because fair notice affects neither legal interpretation nor legal rulings, the defense is considered an issue of remedy, not liability.

Navistar's fair notice argument fails because Navistar has not proven that the applicable regulations are "incomprehensively vague." *Texas Eastern Prod. Pipeline Co. v. Occupational Safety and Health Review Comm'n*, 827 F.2d 46 (1987). Further, EPA's interpretation of these regulations is not unforeseen. *U.S. v. Am. Nat'l Can Co.*, 126 F. Supp. 2d 521, 530 (N.D. Ill. 2000). With its fair notice argument Navistar is simply attempting to create a genuine issue of material fact by recharacterizing regulatory obligations that have existed for years, then claiming it lacked notice. Opp. Br. at 23–26. Regulations requiring a specific level of engine completeness existed for decades and have applied to Navistar for many years. *See*, 40 C.F.R. § 85.2304(b).

### A. The Fair Notice Defense is Irrelevant to the Liability Phase.

Because the fair notice doctrine is an administrative law principle born of due process protections, the defense addresses the fairness of imposing a penalty in a specific case. *See Trinity Broadcasting of Florida v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000); *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1228–29 (D.C. Cir. 1995). It inherently concerns the propriety of the punishment, not the law itself or its operation.[20] Therefore, while the United States vigorously

---

[20] *See Trinity Broadcasting*, 211 F.3d at 628 (defendant's fair notice argument considered only because "the Commission imposed a severe penalty"); *Gen. Elec.*, 53 F.3d at 1331 (deferring to EPA's regulatory interpretation, but considering defendant's fair notice argument "because the agency imposed a fine"); *see also United States v. S. Ind. Gas & Elec. Co.*, 245 F. Supp. 2d 994,

disagrees that Navistar lacked fair notice, the defense is irrelevant to liability because it only speaks to remedy. As such, Navistar should not be allowed to use the defense as a shield against summary judgment on liability.

## B. Navistar's Fair Notice Defense Fails Because the Applicable Regulations Are Not "Incomprehensibly Vague."

Due process does not require that the rules be "models of clarity," and here they are perfectly clear. *Texas Eastern*, 827 F.2d at 50 (("due process requires only a fair and reasonable warning of even imprecisely drafted regulations….The regulations, while not models of clarity, should not have been incomprehensibly vague to Texas Eastern [Defendant].");  *United States v. Pitt-Des Moines, Inc.*, 970 F. Supp. 1346, 1350 (N.D. Ill. 1997). Navistar cannot show that EPA's regulations are incomprehensibly vague and makes no such argument directly. The fact that Navistar manufactured engines for decades under the same regulations it now claims are vague suggests that it understood applicable regulations at all times prior to 2009. Opp. Br. at 16; *see also See Pitt-Des Moines, Inc.*, 970 F. Supp. at 1350. Navistar's complaint that it did not understand the regulations, without more, is wholly insufficient to defeat the United States' Summary Judgment Motion. *Mills*, 83 F.3d at 842.

## C. EPA's Interpretation of Applicable Regulations Has Not Changed and is Not Unforeseen.

As long as EPA's interpretation of applicable regulations is not "unforeseen," fair notice has been provided. *U.S. v. Am. Nat'l Can Co.*, 126 F. Supp. 2d 521, 530 (N.D. Ill. 2000). Navistar presents no evidence to support its claim that EPA's interpretation is unforeseen. EPA's present application of HDDE regulations is based on the plain language of the regulations, so its approach is neither novel nor surprising. Indeed, EPA's interpretation has been consistent for

1023 & n.21 (S.D. Ind. 2003) (discussing *Rollins Envtl. Srvcs. Inc. v. EPA*, 937 F.2d 649 (D.C. Cir. 1991)).

decades, as confirmed by the Agency's 1981 letter to Navistar's predecessor that explained HDDE manufacturers were required to certify their engines once those engines were complete: "Whoever completes a ¾ block engine…becomes the manufacturer of that engine, and must … *certify the engine* before …introducing it into commerce. *Failure to comply with this requirement constitutes a violation* [of the Act]..." International Harvester Letter, 1981 (Exh. H) (emphasis added). This guidance tracks applicable EPA regulations that require on-highway engines to be materially identical to COC applications—which requires at least installation of a fuel components, emission control devices, onboard diagnostic systems—before being offered into commerce. *See* Argument Section I.

The cases Navistar cites in support of this argument are inapposite. *In re CWM Chem. Servs., Inc.* involves a Defendant that lacked fair notice of a rule that EPA attempted to enforce even though it had been removed from regulations ten years prior. 6 E.A.D. 1, 1 (EAB 1995). The regulatory obligations Navistar violated have been in force since 1995. In *U.S. v. Am. Nat'l Can Co.*, the Defendant was not given fair notice that scavengers sneaking onto its facility and disturbing asbestos in order to steal scrap metal could be construed as "renovating" under the Clean Air Act. 126 F. Supp. 2d 521, 530 (N.D. Ill. 2000). EPA makes no such unforeseeable interpretation here.

In summary, Navistar's fair notice defense is inapplicable to this Court's liability determination.  Further, Navistar presents no evidence to support any of its arguments, and none give rise to genuine issues of material fact necessary to defeat the United States' Summary Judgment Motion.[21]

---

[21] Navistar's Opposition treated the rest of its Affirmative Defenses with a footnote, suggesting that discovery was needed to establish facts sufficient to support them and defeat the United States' Summary Judgment Motion. Without a "scintilla of evidence in support of the

## CONCLUSION

When Navistar's Opposition is stripped of its unreasonable reliance on 40 C.F.R. § 1068 and unsupported defenses, it is left only with its own admissions of liability. Through confusing misapplication of regulations reserved for nonroad engines and recitation of prior defenses with no additional evidence, Navistar attempts to complicate this matter beyond the reach of a summary judgment ruling. But none of Navistar's arguments can alter the consequence of its admissions. The United States respectfully requests that the Court grant it summary judgment on Navistar's 7,749 violations of the Act.

Respectfully Submitted,

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


Dated:   July 28, 2016

*/s/Abigail E. Andre*
ABIGAIL E. ANDRE
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
999 18th Street – South Terrace, Suite 370
Denver, CO 80202
(303) 844-1379
abigail.andre@usdoj.gov

DEANNA J. CHANG
Senior Counsel
Environmental Enforcement Section
U.S Department of Justice
805 SW Broadway, Suite 600
Portland, OR 97205
(503) 231-2128
deanna.chang@usdoj.gov

---

nonmovant's position," *Kegley v. AT&T Corp.*, 1998 WL 895674, at *2, Navistar has not carried its burden necessary to defeat summary judgment. Indeed, as explained in Argument Section, V.A., even the discovery Navistar seeks cannot change the facts of Navistar's liability.

KEITH T. TASHIMA
Senior Attorney
SEAN CARMAN
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
PO Box 7611 Ben Franklin Station
Washington, DC 20001-7611
(202) 616-9643 (Tashima)
(202) 514-2746 (Carman)
keith.tashima@usdoj.gov
sean.carman@usdoj.gov

OF COUNSEL:

ED KULSCHINKSY
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW
Room 1142C, Mailcode 2242A
Washington, DC 20460
(202) 564-4133
kulschinsky.edward@epa.gov