UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

           Plaintiff,

    v.

NAVISTAR INTERNATIONAL CORP., and
NAVISTAR, INC.,

           Defendants.

No. 15 CV 6143
Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

The United States of America, at the request of the Environmental Protection
Agency, brought this case against Navistar, Inc., and Navistar International
Corporation alleging violations of the Clean Air Act. The government alleges that
defendants introduced on-highway engines into commerce without first obtaining a
Certificate of Conformity for those engines. The government has moved for
summary judgment, arguing that the language of the EPA regulations clearly
establishes liability when applied to the undisputed facts of this case. Both
defendants argue, in response, that the language of the EPA regulations does not
clearly address the central legal question in this case. Navistar International
argues in a cross-motion for summary judgment that it is merely a passive holding
company that does not conduct the sort of business covered by the Clean Air Act.

I.      **Background**

Navistar International is a company with offices in Lisle, Illinois. The
company has two operating entities, Navistar, Inc., the manufacturing wing of the

business, and Navistar Financial Corporation. Navistar, Inc., manufactures and distributes a heavy-duty diesel engine.[1] The government's suit accuses defendants of selling 7,749 engines in violation of the Clean Air Act. The act requires that a manufacturer of on-highway engines apply for and obtain a Certificate of Conformity for those engines before entering them into commerce. *See* 42 U.S.C. § 7522. Navistar obtained a certificate for engines produced in Model Year 2009 but did not obtain a certificate for Model Year 2010 engines.

Navistar initiated the production of the 7,749 heavy-duty diesel engines at issue here, called the "Subject Engines" by the parties, in 2009. But the company did not fully assemble the Subject Engines until 2010. Navistar argues that the Subject Engines were "produced" in 2009 because the company installed a component called a crankshaft into the engine block before December 31, 2009. If indeed Navistar is correct that the applicable EPA regulations consider an engine "produced" when the crankshaft is in the engine block, the Subject Engines would be covered by the Model Year 2009 certificate, and defendants would avoid CAA liability.

The government does not dispute that the crankshaft was in the engine block before the end of 2009, but it argues that more is required for an engine to be considered "produced" under the CAA. Under the government's interpretation of the regulations, an engine is only considered "produced" once the manufacturer has completed all manufacturing and assembling processes such that the engine becomes "saleable." Because it is undisputed that these processes were not

---

[1] I refer to Navistar, Inc., as Navistar, to distinguish it from Navistar International.

completed on the Subject Engines before December 31, 2009, the United States concluded that the Subject Engines were not covered by the 2009 certificate.

In November 2010, the EPA sent to Navistar International and any of its affiliates a request for information pursuant to Section 208 of the Clean Air Act. Navistar's response revealed that the Subject Engines' "Crank Install" date was in 2009, but their "E Build Date" was in 2010. It is undisputed that Navistar sold or offered for sale the Subject Engines into commerce.

The facts are disputed as to whether Navistar International is merely a passive holding company of Navistar or something more. Navistar International has submitted the affidavits of two Navistar employees who state that International passively holds the stock of Navistar, Inc. They state that International has only one employee and has no manufacturing facilities or operations. They state that as a holding company, Navistar International has not engaged in any design, manufacture, assembly, or sale of the engines at issue in this litigation.

The government cites a variety of documents in which Navistar International held itself out as more than a mere holding company. A "Fact Book" released by either Navistar International or Navistar, Inc., in 2015 stated that "Navistar International Corporation (NYSE: NAV) is an international manufacturer of International® brand commercial and military trucks, proprietary diesel engines, IC Bus™ brand school and commercial buses, as well as a provider of service parts for trucks and diesel engines." The 2015 Fact Book said that International has 13,200 active employees and manufacturing facilities in 4 countries. It stated, "We

manufacture and distribute Class 4 through 8 trucks and buses," and, "we design and manufacture proprietary diesel engines . . ." A 2011 Fact Book similarly represented International as a manufacturer.

In Navistar International's 2009 SEC filing, the company described itself as "the nation's largest combined commercial truck, school bus and mid-range diesel engine producer." In press releases, International identified itself as a manufacturer.

The government moves for summary judgment on liability, Navistar International moves for summary judgment, and the defendants move to strike a section of the government's reply brief and to supplement the record.

## II.    Legal Standard

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

When considering the government's motion for summary judgment, I view the facts in the light most favorable to the defendants, and when considering International's cross-motion, I view the facts in the light most favorable to the

government. *See First State Bank of Monticello v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

## III.   Discussion

Title II of the Clean Air Act requires the EPA to set out standards regulating the emission of air pollutants from any class of new motor engines. 42 U.S.C. § 7521(a)(1). The EPA regulates air pollutants which "may reasonably be anticipated to endanger public health or welfare." *Id.* The government's theory of liability arises under § 203(a) of the act, which requires an engine manufacturer to obtain a Certificate of Conformity that verifies that an engine complies with the EPA's air pollutant regulations. To establish a violation of § 203(a), the government must prove that (1) the defendant is a "manufacturer of new motor vehicle engines," (2) the defendant distributed in commerce, sold, offered for sale, introduced or delivered for introduction into commerce the engines or caused one of those acts to occur, and (3) the engines were not covered by a certificate. *See* 42 U.S.C. § 7522.

Navistar challenges whether the United States can show the third element of § 203(a), arguing that all of the Subject Engines were covered by a Model Year 2009 certificate. Navistar International challenges whether any of the three elements apply to it, arguing it is merely a passive holding company that neither manufactures nor distributes engines.

### A.   The Government's Motion for Summary Judgment

The question of Navistar's liability turns entirely on the question of whether an engine that was not fully assembled by the end of 2009 could still be covered by a

2009 certificate. Navistar never obtained a Model Year 2010 certificate for the Subject Engines. The accompanying regulations to the EPA's air pollutant program state that "[E]ngines produced after December 31 of the calendar year for which the model year is named are not covered by a certificate of conformity for that model year." 40 C.F.R § 85.2305.

To meet the requirements of the act, an on-highway engine manufacturer applies for a certificate to cover an entire engine family, which is defined as a group of engines built in the same Model Year that have similar emissions and physical characteristics. 40 C.F.R. § 86.096-24(a)(1)–(2). When a company obtains a certificate from the EPA, that certificate is effective for all "vehicles or engines named in such certificate and produced during the annual production period." 40 C.F.R. § 85.2305.

To determine if a particular engine is covered by a particular certificate, one must first determine what the "annual production period" is for the engine family. The annual production period begins either when any engine within that family is "first produced" or on January 2 of the calendar year preceding the model year, whichever date is later. 40 C.F.R. § 85.2304. That production period ends "when the last such vehicle or engine is produced; or on December 31 of the calendar year for which the model year is named, whichever date is sooner." *Id.*

There is no factual dispute over the Subject Engines' production timeline. The Subject Engines had a crankshaft before December 31, 2009, but were not fully manufactured and assembled such that they could become saleable until after that

date. So when is an on-highway engine considered "produced" under the applicable EPA regulations?

The proper interpretation of the regulation begins "by determining whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Ioffe v. Skokie Motor Sales, Inc.*, 414 F.3d 708, 710 (7th Cir. 2005); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

The act distinguishes between on-highway and nonroad engines. *See* 42 U.S.C. § 7550. The EPA has promulgated regulations for on-highway engines primarily in 40 C.F.R. Parts 85 and 86. Provisions for nonroad engines, such as engines for locomotives or marine vessels, are set out elsewhere, including in 40 C.F.R. Part 1068. The government argues that the on-highway regulations plainly and unambiguously provide that an engine is only considered "produced" when all manufacturing and assembling processes necessary to make the engine "saleable" have occurred. The EPA's on-highway regulations distinguish between engines produced subject to the "Delegated-Assembly Exemption" and those that are not. This exemption gives engine manufacturers flexibility to ship on-highway heavy-duty diesel engines before installation of certificate of conformity-specified devices. The Subject Engines contain both delegated-assembly exempt and non-exempt engines. The government argues that the on-highway regulations clearly define

when both exempt and non-exempt engines become "produced" engines. Navistar's basic argument is that the on-highway regulations are silent about when an engine is "produced," thus the nonroad regulations, set out in 40 C.F.R. § 1068, provide the answer. The nonroad regulations suggest that an engine's model year is determined by the date that a crankshaft enters the engine block.

### 1. Non-Delegated-Assembly Exempt Engines

Subpart X of 40 C.F.R. § 85 of the Code of Federal Regulations provides guidance on how to determine the model year for motor vehicles and engines used in motor vehicles. These regulations specify how to determine the beginning of a particular engine family's "annual production period." This period can begin on the date on which the first engine in a particular engine family is "produced." 40 C.F.R. § 85.2304. An engine is "first produced" under these regulations on "that calendar date on which a manufacturer completes all manufacturing and assembling processes necessary to produce the first saleable unit of the designated model which is in all material respects the same as the vehicle or engine described in the manufacturer's application for certification." 40 C.F.R. § 85.2304(b).

This regulation does not explicitly state that the definition of "first produced" also applies when determining the point at which other engines in the engine family become "produced." But the regulation need not make this connection explicit. In allowing that an annual production period can begin when an engine is produced, the regulation defines "produced." The text of 40 C.F.R. § 85.2304(b) provides that an engine is produced when all manufacturing and assembling processes necessary

to produce a saleable unit are complete. Even though this definition of production is offered in the context of explaining when an engine is *first* produced, the text in no way limits the scope of "produced" to the first engine in the family. Furthermore, because the plain and unambiguous meaning of a particular provision is assessed in the context of the statute as a whole, it is sensible to read language in a subpart titled "Determination of Model Year for Motor Vehicles and Engines. . ." in a manner that would instruct manufacturers on how to determine whether an individual engine was produced in Model Year 2009 or Model Year 2010.

Navistar argues that equating "first produced" with "produced" is like equating apples and oranges. Navistar roots this argument in the purported purpose the EPA had when promulgating Subpart X of Part 85 in the EPA's regulations. The company argues that this section had the limited purpose of defining a "Job 1 date." The section was added in response to confusion in the industry about how to determine that date. There were split court decisions about the question of when a model year begins, and the EPA clarified that split through rulemaking. Furthermore, this subpart arose out of the tension between federal regulations and State of California emissions standards, which are addressed in Clean Air Act § 177.

Navistar may be correct about the EPA's motivations when promulgating this language, though it is misleading to suggest that Subpart X could only apply to issues arising out of California emissions standards. The title of Subpart X notes that the regulations guide manufacturers determining a model year under both

§ 177, which addresses the California emissions issue, and "Part A of Title II of the Clean Air Act." That section of the act provides the basis for the government's case. But even if Navistar is right about the motive behind 40 C.F.R. § 85.2304(b), the regulation still defined what it means for an on-highway engine to be "produced." Nothing in the text limits that definition of produced to a particular purpose. Thus applying the text's definition of "produced" to all engines in an engine family is both the best reading of the words in the regulation and consistent with Subpart X's broader purpose of providing guidance to manufacturers in how to determine the model year of a motor vehicle engines.

Other language in the EPA's regulations sets out an alternative method for making a production year determination. In 40 C.F.R. § 1068.30, the EPA regulations provide that "date of manufacture" means "the date on which the crankshaft is installed in an engine block. . ." 40 C.F.R. § 1068.30. Furthermore, 40 C.F.R. § 1068.103 states that "[a]n engine is generally assigned a model year based on its date of manufacture, which is typically based on the date the crankshaft is installed in the engine (see § 1068.30))." 40 C.F.R. § 1068.103. Navistar states that, given the clear language of § 1068, it was the EPA that adopted the "crankshaft in the block" understanding of the word "produced," and Navistar dutifully complied by installing the crankshaft into the Subject Engines before December 31, 2009.

I reject Navistar's reliance on § 1068 for two reasons. First, the on-highway regulations use the term "produced" rather than "date of manufacture," casting doubt on the purported overlap between § 1068 and § 85. Second, 40 C.F.R. § 1068

expressly excludes application of its language to heavy-duty diesel engines. In the section titled "Does this part apply to me?" the regulations in place in 2009 stated "This part does not apply to any of the following engine or vehicle categories" and lists "Heavy-duty motor vehicles and motor vehicle engines." 40 C.F.R. § 1068.1 (2009). While it is true that *some* parts of § 1068 were incorporated into 40 CFR parts 85 and 86, Navistar has not pointed to a section of the on-highway regulations that expressly incorporates the nonroad engine definition of "date of manufacture" into the heavy-duty diesel engine regulatory scheme. Thus there is no conflict or ambiguity arising out of § 1068's "crankshaft" rule because the regulation expressly states that such a rule does not apply to heavy-duty diesel engines.

Navistar argues that, aside from the text of § 1068, the EPA made representations suggesting that the "crankshaft" rule would one day apply to on-highway engines. The EPA repeatedly asked on-highway manufacturers to "take note" of § 1068 and said that the general compliance provisions of § 1068 would eventually apply to heavy-duty diesel engines. When § 1068 was amended in 2008, Navistar met with the EPA to discuss Navistar's compliance and informed the EPA that they would install the crankshaft in the block by the end of 2009 in the Subject Engines. The EPA did not push back on Navistar's plan. Furthermore, Navistar has moved to amend the record to include a 2016 EPA Final Rule that now expressly applies the crankshaft rule to on-highway engines. I grant that motion to amend the record and agree with Navistar that the EPA has long suggested that it would adopt the crankshaft rule and now has. But neither that slow transition toward the

crankshaft rule nor the EPA's silence in response to Navistar's adherence to the crankshaft rule in 2009 changes the fact that the language of the EPA's on-highway regulations at the time the Subject Engines were being manufactured and assembled clearly set out a different rule. The language of the regulation at the time in question, not the EPA's subsequent modifications to its regulations, determines Navistar's liability.

Navistar's final argument is that the text of 40 C.F.R. § 85 cannot control this case when the EPA had never before cited the regulation either in an enforcement action or when communicating with members of the industry. Mitsubishi asked for clarification on this question in 1990 and was first told that an engine could still be certified even if it lacked components necessary for operation. Four months later, the EPA said that an engine was only a new engine once it was in a form capable for operating a motor vehicle. In neither communication did the EPA cite the regulation that decides this case. A Navistar executive testified that in 2006 the company understood the EPA's position to be that an engine would be considered a 2006 engine so long as the assembly process had begun in 2006.

EPA's enforcement and communication pattern has not been consistent over the past 20 years. But the consistency of application would only become an issue in this case if the text of the applicable regulation were not clear. *Exelon Generation Co., LLC v. Local 15, Int'l Bhd. of Elec. Workers, AFL-CIO*, 676 F.3d 566, 570 (7th Cir. 2012) ("If the meaning of the regulatory text is clear, the task is complete."). In plain and unambiguous terms, 40 C.F.R. § 85.2304(b) sets out that an engine is only

considered produced when all manufacturing and assembling processes necessary to produce a saleable unit are complete.

Navistar has moved to strike the portions of the government's reply brief in which it argues that the EPA is owed deference given a history of consistent interpretation. That motion is denied, but the arguments in reply are immaterial. A court need only turn to the issue of deference if the language of the applicable regulation is ambiguous. *Exelon Generation Co.*, 676 F.3d at 570. Given the clarity of the applicable on-highway regulations, I do not reach the issue of deference.

### 2. *Delegated-Assembly Exempt Engines*

Turning to Delegated-Assembly Exempt engines, the government argues that the regulations also clearly specify when those engines are considered produced. The Code of Federal Regulations promulgated in 2008 contained a section titled "Delegated-assembly exemption" that provided that "an engine you produce under this section becomes new when it is fully assembled, except for aftertreatment devices, for the first time. Use this date to determine the engine's model year." 40 C.F.R. § 85.1713(d) (2008). This language is plain and unambiguous. Subject Engines produced pursuant to a delegated-assembly exemption could not be covered by a 2009 certificate when they were not fully assembled until 2010.

Navistar does not deny that such language is clear, but the company disputes whether this regulation was applicable in 2009. In October 2008, a new version of 40 C.F.R. § 85.1713 was promulgated, which did away with the "fully assembled" clause and directed on-highway manufacturers to a section of the nonroad

regulations, 40 CFR § 1068.261, for instruction on how to apply the exemption. Notably, the new version of 40 C.F.R. § 85.1713 did not incorporate the section of the nonroad regulations that established the crankshaft rule. This new version of 40 C.F.R. § 85.1713 noted that it applied "starting in the 2010 model year."

The 2009 edition of the Code of Federal Regulations therefore did not contain the "fully assembled" language but also expressly provided that the new version would not apply until Model Year 2010. There was an apparent gap in the regulations, but the delegated-assembly exemption was still available to manufacturers in 2009. Navistar sought and obtained an exemption for some of the Subject Engines. The best reading of the regulations is that the 2008 version of the exemption remained in force until the new version became effective in Model Year 2010. Thus an engine's model year was still determined by the date the engine was fully assembled. The parties dispute whether or not the failure to include the "fully assembled" language was a clerical error. Regardless of why the language did not appear in the 2009 regulations, all parties agreed that some version of the exemption was applicable and that the new version expressly did not apply until 2010. There was no place to look other than the last applicable version of 40 C.F.R. § 85.1713(d), which contained the fully assembled provision.

Even if the new version of 40 C.F.R. § 85.1713(d) applied (despite clear language reserving its application to 2010), that new regulation did not incorporate the nonroad crankshaft rule into the on-highway delegated-assembly exemption. Thus, under either version of 40 C.F.R. § 85.1713, the Subject Engines designated

as delegated-assembly engines could not have been considered Model Year 2009 if they were not fully assembled until 2010.

For both exempt and non-exempt Subject Engines, the on-highway regulations explain that an engine falls within the model year during which it was fully assembled. Insofar as none of the Subject Engines were fully assembled by December 31, 2009, the engines could not be covered by a 2009 certificate. 40 C.F.R. § 85.2305(d). It is undisputed that Navistar never obtained a 2010 certificate but still entered the Subject Engines into commerce. The sale and distribution of these Subject Engines was therefore a prohibited act under § 203(a) of the Clean Air Act. *See* 42 U.S.C. § 7522.

### 3. *Affirmative Defenses*

Navistar invoked eight affirmative defenses, none of which prevent an entry of summary judgment on the basis of the company's violations of the act. Two of these affirmative defenses, alleging the requested relief is "overbroad" and "obviously unreasonable," relate to remedy rather than liability and will not be addressed in the context of deciding this motion.

The company argues that the government has failed to state a claim upon which relief can be granted. This is merely a recitation of the standard for a motion to dismiss under Rule 12(b)(6), and does not prevent an entry of summary judgment, where the undisputed record establishes liability. Navistar also raises various defenses that assume that the text of the applicable regulations is not clear. The company alleges that the EPA's interpretation of the regulations is

"unreasonable" and that the EPA has failed to sufficiently define what an "engine" is to ensure regulatory compliance. As discussed above, the applicable on-highway regulations in fact do clearly describe when a group of parts are considered a produced engine for purposes of complying with the act's certification requirement. The EPA's interpretation of those regulations in this litigation is consistent with the text and is therefore reasonable.

Navistar next argues that the company lacked fair notice or due process because the EPA's views on the act and its implementation of the regulations have been inconsistent. In making this argument, Navistar argues that the EPA has invented a new "completely assembled rule" for purposes of this litigation. While it is acceptable for an agency to "develop an interpretation of regulatory language for the first time in an adjudication" it must ensure that the application of that interpretation "compl[ies] with the demands of due process." *In re CWM Chem. Servs., Inc.*, 6 E.A.D. 1 (E.P.A. May 15, 1995). Neither *In re CWM* nor the other cases cited by Navistar involved a situation such as this, where the dispositive rule could be found in the text of the regulations, which have been codified for years. *See* 40 C.F.R. §§ 85.2302–85.2304 (1995)–(2015). The "fully assembled" rule was not determined by surmising the intentions behind the regulations, as was the case in *Wisconsin Resources Protection Council v. Flambeau Mining Co.*, 727 F.3d 700, 707–08 (7th Cir. 2013), or by invoking the "spirit" of the regulations, as was the case in *U.S. v. American National Can Co.*, 126 F. Supp. 2d 521, 530 (N.D. Ill. 2000). Rather, the definition of "produced" could be ascertained from the text of the

regulations. Thus neither the fair notice nor the due process defense precludes summary judgment.

Navistar also claims that the government's claim is barred by the doctrines of estoppel, waiver, and laches. These are particularly hard to establish against the United States. The estoppel defense "requires an affirmative act to misrepresent or mislead." *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000). At most, Navistar has shown silence on the part of the EPA as Navistar organized its production timeline in accordance with the crankshaft rule. This silence does not rise to the level of affirmative misleading, nor would affirmative conduct make a difference when the regulatory text is plain and unambiguous. *See Heckler v. Cmty Health Serv. of Crawford Cty.*, 467 U.S. 51, 63–64 (1984) ("…[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to the law.").

Similarly, a waiver defense would only apply if the United States waived its authority under the Clean Air Act with a clear and distinct manifestation to do so. *Am. Nat'l Bank & Trust Co. of Chicago v. K-Mart Corp.*, 717 F.2d 394, 398 (7th Cir. 1983). There are no facts on the record to suggest such a manifestation occurred.

Finally, the doctrine of laches would require a showing of unreasonable delay. Here, the United States filed an enforcement action within the statute of limitations, and Navistar has not shown a detriment caused by the timing of this suit.

Navistar also alleges that it is entitled to an affirmative defense because it has been treated differently than other manufacturers in the same position. But the EPA has "broad discretion" to choose how to best marshal its limited resources. *Massachusetts v. E.P.A.*, 549 U.S. 497, 527 (2007). That discretion allows it to decide when and when not to bring an enforcement action. *Id.*

### 4. *Rule 56(d)*

Navistar's final argument against liability is that I should deny the government's motion because Navistar has not yet received sufficient information in the discovery process that would allow it to thoroughly contest the motion. Federal Rule 56(d) permits a court to deny a summary judgment motion when the defendant cannot present facts essential to justify its opposition. Fed. R Civ. P. 56(d). The rule "is intended as a safeguard against a premature grant of summary judgment." *King v. Cooke*, 26 F.3d 720, 726 (7th Cir. 1994).

Navistar requested discovery regarding whether the EPA's "completely assembled" rule is brand new or longstanding and whether the EPA's exclusion of the delegated-assembly exemption provision in the 2009 Code of Federal Regulations was indeed a clerical error. The government agreed that those subjects were relevant to liability. Navistar now alleges that it has not received information responsive to those discovery requests.

Navistar argues that if it could obtain EPA documents that contradict the "completely assembled rule," it could disprove the government's allegations in this case. Navistar's argument would have merit if the basis of the company's liability

was the EPA's history of regulation and consistency in interpretation. But the deciding factor in this case is the clarity of the language that has been publicly available for years prior to this litigation. Additional documents that shed light on the EPA's internal deliberations about the applicable regulations would not change the plain and unambiguous meaning of the regulations that prohibit selling a heavy-duty diesel engine without first obtaining a certificate of conformity. Furthermore, whether or not the lack of the "fully assembled" provision in the delegated-assembly exemption was due to a clerical error would not change the fact that the applicable text in 2009 expressly reserved application of the new version of 40 C.F.R. § 85.1713 for Model Year 2010. Navistar has not shown what fact it could uncover through the discovery process that would change the meaning of the applicable regulations. Therefore Rule 56(d) does not provide reason to deny the government's motion.

### B.    Navistar International's Cross-Motion for Summary Judgment

While Navistar, Inc., only challenged whether the United States could establish the third element of a CAA § 203(a) claim, Navistar International challenges in a cross-motion for summary judgment whether the United States can establish the first two elements, arguing it is neither a manufacturer of new motor vehicle engines nor a distributor of those engines into commerce.

International supports its motion with affidavits containing the testimony of two Navistar, Inc., employees who describe International as a passive holding

company. These employees testify that the company has only one employee and has no manufacturing facilities or operations.

The government first argues that these employee statements are inadmissible, arguing that they offer legal conclusions and lack a basis in personal knowledge. Neither of these arguments is persuasive. While it is true that the assertion that International does not engage in distribution of new motor vehicles resembles an element of a claim under CAA § 203(a), the question of what a company does is also a question of fact about which lay testimony is entirely appropriate. Furthermore, the two employees have sufficient personal knowledge about International's activities, even though they are not employees of the company. Curt Kramer is a corporate secretary for International, and Thomas Kramer oversees the certification process for engines produced by Navistar, Inc. These roles provide a sufficient basis to draw conclusions about International's institutional structure.

The finding that the employees' testimony is admissible does not establish as a matter of law that International is not a manufacturer subject to the act. The factfinder might find that such testimony is outweighed by other admissible statements about International. The government has offered various documents in which International was described as a manufacturer and producer of engines. The Factbooks noted that International employs 13,200 people. International's SEC filings described the company as a "diesel engine producer." The press releases similarly described the company as a manufacturer and distributor of engines.

International is correct that these representations are at odds with other statements in public documents describing International as a holding company. But the task of weighing the tensions within International's public documents and considering the weight of the employees' testimony is properly left for trial rather than summary judgment.

Finally, the government argues that even if International were a passive holding company, it could still be liable for "causing" Navistar, Inc., to violate CAA § 203(a). 42 U.S.C, § 7522(a) ("The following acts and the causing thereof are prohibited..."). While liability for causing another entity to engage in a prohibited act is possible under the language of the statute, the government cites no case suggesting that a shareholder causes a corporation's acts simply by holding its stock. Either the factfinder at trial will conclude that International manufactured and distributed engines in violation of the CAA, or the factfinder will conclude International is merely a holding company. If the latter is true, there is no evidence of causation that would create liability for International under CAA § 203(a).

## IV.    Conclusion

The United States' motion for summary judgment on the issue of liability [40] is granted with regard to Navistar, Inc., and denied with regard to International. International's cross-motion for summary judgment [57] is denied. Defendants' motion to strike [80] is denied, and defendants' motion to supplement [92] is granted.

ENTER:

Manish S. Shah
United States District Judge

Date: 3/1/2017