# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 15-cv-6143 |
| NAVISTAR, INC., | Judge Mary M. Rowland |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

The United States of America, at the request of the Environmental Protection Agency, brought this case against Navistar, Inc. alleging violations of the Clean Air Act. This Court found that Navistar violated the act by introducing on-highway engines into commerce under a certificate of conformity for the wrong model year. Navistar now moves for partial summary judgement on the issue of whether "Credit Engines," defined below, may be considered in this Court's calculation of Navistar's liability. For the reasons stated below, Navistar's Motion for Summary Judgment [356] is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id*. at 250 (internal quotations omitted).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (internal citation and quotations omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (*citing Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id*. (citation omitted).

2

BACKGROUND[1]

## I. The Regulatory Framework

The Clean Air Act regulates the sale of heavy-duty diesel engines (HDDE) to ensure compliance with pollution emission standards. *See* 42 U.S.C. § 7522(a)(1). It does so by requiring manufacturers to obtain a "certificate of conformity" for their engines before they may be sold. *Id.* These certificates are issued by the EPA to a given engine family on a "model year" basis. 40 C.F.R. § 86.007-30. Every year, engine manufacturers must have the engines produced in that year certified as complying with the EPA's pollution emissions standards. *Id.* The model year ends on December 31 of the same calendar year. 40 C.F.R. § 85.2303.

An engine produced the year after must be certified according to the standards of that model year, which may be more stringent than the previous year. At the time at issue in this case, however, an engine could be sold in year two so long as it had been certified in year one, even if the subsequent model year was held to a higher standard. DSOF ¶ 12. If an engine complied with model year one's standards but not model year two, then it could only be certified and thus legally sold if it had been manufactured in model year one.

---

[1] The facts in this Background section are undisputed unless otherwise noted. Navistar's Rule 56.1 Statement of Facts (Dkt. 360) is abbreviated as "DSOF". The government's Rule 56.1 Statement of Facts (Dkt. 367 Ex. 1, pp. 23-38) is "PSOF". The government responded to Navistar's Statement of Facts at Dkt. 367 Ex. 1, pp. 1-22 and Navistar responded to the government's Statement of Facts at Dkt. 374. Both parties assert several general and specific violations of Local Rule 56.1 in their counterpart's statement of facts. Whether to require strict compliance with Local Rule 56.1 is in the Court's discretion. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019). The objections raised here are not dispositive to the outcome. The Court addresses particular statements of fact or evidence in the opinion as is necessary.

Fully effective in model year 2010, the EPA set more stringent standards on $NO_x$ produced by HDDEs. In model year 2009, the emissions limit was effectively 1.2 grams per brake-horse-power hour of $NO_x$. *See* 40 CFR §§ 86.004-11; 86.007-11. Starting in model year 2010, the limit was lowered to 0.2 grams of $NO_x$. *See* 40 C.F.R. § 86.007-11. An engine family produced in 2010 could be certified if it met this new, more stringent standard.

Alternatively, engines that did not meet this standard might be certified using an EPA program called Averaging, Banking & Trading (AB&T). *See* 40 C.F.R. § 86.004-15(a). This program allows manufacturers to earn credits for producing engines that exceed current model year standards, which can then be used in future years to certify engines that do not meet the new, more stringent limits. *Id.* Manufacturers elect to participate in the AB&T program in their certificate application to the EPA and must also submit annual reports on the number of credits used or generated in the year. *See* 40 C.F.R. § 86.004-15(b). Credits can be banked and used over several model years in the future, and they can be traded between manufacturers. *See* 40 C.F.R. § 86.004-15(a). So, if a manufacturer had produced engines that exceeded EPA requirements on $NO_x$ emissions in the years before 2010, those accumulated credits could be "spent" to certify engines produced in 2010 and after that would otherwise not meet the new standard.

## II. Navistar's "Subject Engines"

Navistar is an engine manufacturer incorporated in Delaware and headquartered in Lisle, Illinois. DSOF ¶ 2. In 2015, this suit arose when the government sued them

for selling 7,749 HDDEs in violation of the Clean Air Act. Dkt. 185, Op. Mot. Summ. J., 2. These 7,749 engines are referred to as the "Subject Engines." *Id*. The central dispute was over whether the Subject Engines were "produced" in model year 2009 or 2010. Navistar had begun production of the engines in calendar year 2009 but did not fully assemble them until calendar year 2010. *Id*. Navistar then sold the engines under their model year 2009 certification. *Id*. Because of the change in emissions standards discussed above, the engines met or exceeded the 2009 standards, but did not meet the more stringent standards of the 2010 model year. Navistar argued that the engines were produced in 2009 because that is when their crankshaft was placed in the engine block. *Id*. The EPA's position was that the Subject Engines were produced in 2010 because that is when they were ready for sale. *Id*.

On summary judgement, the Court agreed with the EPA. *Id*. at 22. An HDDE completed in 2010 could only be sold under a model year 2010 certificate. *Id*. at 11-12. By selling engines produced in 2010 under a model year 2009 certificate, Navistar had violated the Clean Air Act. As a result, Navistar is liable for the sale of the Subject Engines. *Id*. at 22.

The Clean Air Act provides a statutory maximum for damages that may be imposed for its violation. A company may be fined up to $37,500 for each engine sold in violation of the statute. *See* 42 U.S.C. § 7524(a); 40 C.F.R. § 19.4. Navistar sold 7,749 Subject Engines, which means its maximum potential fine is $290,587,500. In evaluating the appropriate civil penalty to award within that maximum, Congress has listed seven factors for a court to consider:

> [T]he gravity of the violation, the economic benefit or savings (if any) resulting from the violation, the size of the violator's business, the violator's history of compliance with this subchapter, action taken to remedy the violation, the effect of the penalty on the violator's ability to continue in business, and such other matters as justice may require.

42 U.S.C. § 7524(b). Along with the civil penalty, a court may also order injunctive relief, including mitigation of the damage caused by a violation. *See United States v. Cinergy Corp.*, 582 F. Supp. 2d 1055, 1060 (S.D. Ind. 2008). This Court will determine the appropriate fine and injunctive relief at trial.

### III. Navistar's "Credit Engines"

At issue in this Motion is a second set of engines, the so-called "Credit Engines." These are engines produced from 2010 onward that were certified using credits derived from the improperly certified Subject Engines.[2] Dkt. 357, Mot. Summ. J., 3. In 2007, Navistar communicated to the EPA their intention to use the AB&T system to bring their engines into compliance starting in the 2010 model years, when stricter $NO_x$ standards would apply. DSOF ¶ 27. From 2007 to 2009, Navistar banked credits from their HDDEs, which surpassed the emissions standards for those model years. *Id.* at ¶ 24. Starting in 2010, Navistar used those banked credits to certify the HDDEs it produced, which without credits would not have met the stricter standard. *Id.* at ¶ 40.

Among those credits were ones generated from the Subject Engines. *Id.* at ¶ 36. Because they had been improperly certified under model year 2009, they produced

---

[2] The parties disagree on how many Credit Engines there are. Dkt. 374, Def. Resp. Pl. 56.1 ¶ 35. This motion is limited to the issue of whether any such Credit Engines could inform the Court's remedies calculation. The number of Credit Engines is a question for trial.

credits Navistar could use in 2010 and beyond. If they had been properly certified in 2010, however, the Subject Engines would have cost credits or not been certified. PSOF ¶ 32.[3] By certifying them under model year 2009 instead of 2010, the Credit Engines became a credit source instead of a credit sink.

The EPA was well aware of Navistar's use of credits. Navistar submitted AB&T reports to the EPA on a yearly basis. DSOF ¶ 35. These reports included the use of credits from the Subject Engines and their consumption by the Credit Engines. *Id.* at ¶¶ 36, 40. The EPA never sent a notice of violation to Navistar alleging that it had insufficient credits. *Id.* at ¶ 39. Instead, the EPA certified Navistar's HDDEs for model years 2010 to 2013 based Navistar's previously banked credits. PSOF ¶ 31. The EPA did issue a notice of violation on January 30, 2012 for the improper certification of the Subject Engine, but the notice made no reference to credits derived from the engines. DSOF ¶¶ 54-55. The EPA continued to issue certificates based on those credits even after issuing the notice. *Id.* at ¶ 43. A government expert has suggested that Navistar received over $40 million in economic benefit from credits gained and not spent through the improper certification of the Subject Engines. *Id.* at ¶ 70. Another expert calculated that the cost of mitigating the Credit Engines' excess emissions through buying trucks with comparable engines would be over $120 million. *Id.* at ¶ 71.

---

[3] Navistar objects to this fact on the grounds that they could have obtained credits through some other means. Dkt. 374, Def. Resp. Pl. 56.1 ¶ 32. While this may be true, the company does not dispute that the Subject Engines themselves could not have been a source of credits.

7

Navistar now moves for summary judgement on whether the Court may include the economic benefit and mitigation costs of the Credit Engines in its calculation of remedies.

## ANALYSIS

Navistar raises three affirmative defenses that it says prohibit the Court from considering the Credit Engines when calculating the remedy: laches, due process, and the 8th Amendment bar on excessive fines. We consider each defense in turn and determine that they each fail. Meanwhile, the plain language of the Clean Air Act requires the Court to consider the Credit Engines when fashioning relief. As a result, Navistar's Motion for Summary Judgement is denied.

### I. Laches Do Not Bar This Suit

Navistar first raises the defense of laches. The government's delay in seeking remedies for the Credit Engines should, according to Navistar, prevent it from obtaining equitable relief based on the engines. This bar would extend to the potentially millions of dollars of mitigation the government may seek from the Court.

As a threshold matter, we must determine whether laches apply against the government in this context. Generally speaking, "the United States is not . . . subject to the defense of laches in enforcing its rights." *United States v. Summerlin*, 310 U.S. 414, 416 (1940); *see also Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 514 (2004) (Kennedy, J., dissenting) (noting that laches does not apply against the government and that the "EPA's enforcement authority can—indeed, must—be exercised at any point"). Still, the Seventh Circuit has recognized some narrow

exceptions to this rule. Although there is no definitive list, the Seventh Circuit in *United States v. Admin. Enterprises, Inc.* suggested three situations where laches might apply against the government. 46 F.3d 670, 673 (7th Cir. 1995). These are: 1) the most "egregious instances" of government delay; 2) suits not governed by a statute of limitations; 3) suits in which the government is seeking to enforce "private rights" as opposed to those of a sovereign. *Id.* If laches is ever a valid defense against the government, it would be limited to these narrow situations. *See Groves v. United States*, No. 16 C 2485, 2017 WL 1806593, at *6 (N.D. Ill. May 5, 2017).

The instant suit does not fit into any of those situations. The government's delay here was not "egregious." Navistar began relying on credits to certify engines in 2010. Suit was brought in 2015. The Credit Engines emerged as a point of contention after the initial summary judgement in 2017. At most, the government might be said to have delayed eight years in seeking remedies related to the Credit Engines. *See* Dkt. 357, Mot. Summ. J., 10. This court has denied laches defense after longer delays than that. *Compare Groves*, 2017 WL at *6 (holding that the government's ten-year delay in bringing suit was not "egregious"); *with Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 279 (2d Cir. 2005) (holding that the government's claims were barred by laches when based on events that took place two hundred years ago). Navistar, meanwhile, points to no cases that suggest that this delay was "egregious."

The other two categories also do not apply. The general federal statute of limitations, 28 U.S.C. § 2462, governs suits brought for a civil penalty under the Clean Air Act. *United States v. Midwest Generation, LLC*, 720 F.3d 644, 646 (7th Cir.

9

2013). And in enforcing the Clean Air Act, the government is clearly acting in its sovereign capacity. *Massachusetts v. E.P.A.*, 549 U.S. 497, 498 (2007) (The federal government exercises its "sovereign prerogative" when enforcing the Clean Air Act.) This contrasts with cases where the government was enforcing its own or another's private rights, as in cases involving the government drawing on commercial paper or enforcing a worker's rights. *See Clearfield Trust Co. v. United States*, 318 U.S. 363, 369 (1943); *Equal Employment Opportunity Comm'n v. Massey-Ferguson, Inc.*, 622 F.2d 271, 275 (7th Cir. 1980). This litigation does not fall into the narrow set of cases in which laches may be a valid defense against the government.

Navistar argues that laches can run against the government outside of the three categories discussed above. In support, the company cites a Seventh Circuit case from 1990 that stated that "laches is generally and we think correctly assumed to be applicable to suits by government agencies." *National Labor Relations Board v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 894 (7th Cir.1990).

Just two years later, however, another Seventh Circuit opinion implicitly cabined *P\*I\*E*'s sweeping language. *See Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1090 (7th Cir.1992). *Martin* reasserted the government's general immunity to laches, while acknowledging that the defense could apply when the government was furthering "discrete" or "individual" interests. *Id.* This was consistent with *P\*I\*E* which, despite its more general dicta, involved the federal government enforcing a private right on behalf of an employee. *See U.S. S.E.C. v. Fisher*, No. 07 C 4483, 2009 WL 780215, at \*1 (N.D. Ill. Mar. 20, 2009). Subsequent

cases have emphasized this private versus public interest distinction in determining the applicability of laches. *See, e.g., U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 195 F. Supp. 3d 996, 1010 (N.D. Ill. 2016); *United States v. Klein*, No. 00 C 6301, 2001 WL 1654771, at *4 (N.D. Ill. Dec. 21, 2001). And, as discussed above, in this case the government is acting in its sovereign capacity on behalf of the public interest. A laches defense cannot stand against the government in this case.

### III. Navistar's Due Process Rights Would Not Be Violated

Navistar's next defense rests upon its right to due process. *See* U.S. Const. amend. V. Navistar argues that including the Credit Engines in the Court's remedies calculus would violate due process because it would retroactively increase the company's liability. *See Lara-Ruiz v. INS*, 241 F.3d 934, 943 (7th Cir. 2001) ("Applying a new law retroactively to conduct completed before its enactment may violate due process if it . . . increases a party's liability for past conduct.") (citations omitted); *Durable Mfg. Co. v. United States DOL*, 578 F.3d 497, 503 (7th Cir. 2009) (applying this principle to agency regulations). Navistar contends that including the Credit Engines punishes it for stockpiling engines and thus generating extra credits, behavior that was not prohibited by regulation at the time but has been subsequently. DSOF ¶¶ 15, 17. In support, the company points to an EPA investigation, which it claims was primarily focused on stockpiling. The EPA has no legal basis to punish Navistar for its stockpiling, and so, according to Navistar, the agency is smuggling the punishment into this lawsuit sub rosa.

11

The United States, for its part, says that it is not seeking to hold Navistar liable for any stockpiling activity. Instead, it simply wants to introduce the sale and excess emissions of the Credit Engines as evidence for the Court to consider when fashioning its relief.

The dispositive question, then, is whether the CAA permits this Court to consider the Credit Engines in its calculations of remedies. If it does, Navistar's liability would not be "retroactively increased" because such engines would always have been within the Court's consideration. The rule change regarding stockpiling would be irrelevant. If it had never been promulgated, the Court could still properly consider the Credit Engines when determining the remedy. In that case, whatever the EPA's internal motivations, Navistar's due process right would not be violated.

As discussed above, the CAA requires the Court to consider "the economic benefit or savings (if any) resulting from the violation." 42 U.S.C. § 7524(b). If the Subject Engines had been certified under model year 2010 as required, they would have been held to a more stringent emissions standard and would not have generated any credits. Instead, by being improperly certified as model year 2009, they generated credits that could be traded with other manufacturers and used to certify engines. These credits indisputably have economic value and so their creation was an economic benefit of the violation. In so far as those credits were then used to certify other engines, the profits from those engines are also an economic benefit resulting from the violation. By the same logic, when determining equitable relief, the emissions produced by the Credit Engines are a result of the violation. These benefits

to Navistar and broader harms to the community can all be traced to "the introduction into commerce of the Subject Engines." Dkt. 6, Am. Compl., 9. If they had never been sold, the credits would never have been generated, and so on.

The plaint text of the statute thus suggests that the Credit Engines should be considered when deciding relief. Navistar has not offered any arguments for why the plain reading is incorrect. That the stockpiling was legal at the time is irrelevant. The statute tells us to consider the "economic benefit" resulting from the violation, not the "illegal economic benefit." Considering the Credit Engines would not retroactively increase Navistar's liability, and would not result in a violation of Navistar's right to due process.

### IV. An Award Based on Credit Engines Would Not Necessarily Violate the 8th Amendment

The 8th Amendment prohibits "excessive fines." U.S. Const. amend. VIII. Usually, determining whether a fine is excessive is a fact-dependent inquiry that requires a trial. *See United States v. Malewicka*, 664 F.3d 1099, 1104 (7th Cir. 2011) (stating that courts must consider "the nature of the harm caused by the defendant's conduct" when evaluating a fine). Navistar tries to sidestep these factual questions by arguing that "[a]ny remedy based on the Credit Engines" would violate the 8th Amendment, and so the issue can be resolved at summary judgement. Dkt. 373, Mot. Summ. J., 13 (emphasis added).

To support this view, Navistar points to the government expert reports that estimate the economic benefit the company received from the Credit Engines and the cost to mitigate their excess emissions. *See* DSOF ¶¶ 70-71. Navistar argues, based

13

on the nature of its violation, the large dollar value estimated by the experts, and the lesser penalties imposed for similar violations, that the government's proposed remedy would constitute an excessive fine. Navistar then concludes that this means that "any remedy based on the Credit Engines" would be "grossly disproportional." Dkt. 373, Def. Motion for Summary Judgement, at 15.

Of course, the one does not follow from the other. Navistar cites no cases for the proposition that a plaintiff requesting excessive damages renders any award unconstitutional. Even if the remedies the government eventually requests at trial are excessive, which the Court offers no opinion on at this point, it is immaterial. The relevant question for 8th Amendment analysis is whether the remedy the Court actually awards constitutes an excessive fine. *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (stating that 8th Amendment analysis turns on the proportionality between the "amount of the forfeiture" and the "gravity of the offense"). It is not as if the government experts' estimates are the only possible remedy the Court could order. In fact, Navistar, in its Reply to the government's Statement of Additional Facts, disputes the accuracy of those estimates. Dkt. 374, Def. Resp. Pl. 56.1 ¶¶ 39-40. The government requesting $100 million in mitigation would not somehow render a civil penalty of $50 unconstitutional.

Putting aside the faulty inference from large requested damages, there is no reason to think that an award based on the Credit Engines would necessarily be unconstitutional. Appropriately considering all the economic benefits Navistar gained and the harm it caused through its violation is not excessive. *See United States*

14

*v. Gulf Park Water Co.*, 14 F. Supp. 2d 854, 862 (S.D. Miss. 1998) ("A defendant should not be placed in a better position, due to its failure to comply with the law, than it would be in if it had made the necessary expenditures to comply with the law."). Thus, the 8th Amendment does not bar this Court from including the Credit Engines in our calculation of remedies.[4]

## CONCLUSION

For the stated reasons, Navistar's motion for summary judgment [356] is denied.

E N T E R :

Dated: December 21, 2020

_____

MARY M. ROWLAND
United States District Judge

---

[4] The parties also disagree about whether mitigation ordered in this case would constitute a "fine" under the 8th Amendment. Because Navistar cannot show at this stage that the remedy the Court will impose is "excessive," we do not reach that question here.